# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
C.A. No.

20    1102

---

SASHA HOFFMAN,

Plaintiff,

v.

THRAS.IO, INC., JOSHUA SILBERSTEIN, and
CARLOS CASHMAN,

Defendants.

---

## **COMPLAINT**

Plaintiff Sasha Hoffman ("Ms. Hoffman" or "Plaintiff") brings this Complaint against

Defendants Thras.io, Inc. ("Thras.io" or the "Company"), Joshua Silberstein ("Silberstein"), and

Carlos Cashman ("Cashman") (collectively, "Defendants") and states as follows:

## **INTRODUCTION**

1.      This action seeks a remedy for Defendants' misclassification of Ms. Hoffman as

an independent contractor and their refusal to provide her with the fully earned, vested Thras.io

equity repeatedly promised to her in return for her work in helping to get Thras.io off the ground.

In early 2019, Defendants recruited Ms. Hoffman to serve in a senior management role for

Thras.io, which was then just a promising start-up.  Like most start-ups, Thras.io could not afford

to pay Ms. Hoffman as much as she would command from an established company, and so the

promise of equity in the Company and potential for wealth creation was a critical component of

persuading Ms. Hoffman to invest her time and talents in Thras.io.

2.     The Parties agreed that Ms. Hoffman would perform the role for a "trial period," to ensure the match was a good fit.  Defendants promised Ms. Hoffman an equity grant of between $1 million and $2 million, which would vest over 4 years, but Defendants also told Ms. Hoffman that all of the Company's employees were waiting for their equity grants because the Company did not have a valid "409A Valuation" – a valuation of the Company for the purpose of setting the price of equity grants to employees in a manner that satisfies the IRS and avoids tax liability for the employee at the time of the grant.

3.     On October 30, 2019, just before Ms. Hoffman ultimately left the Company after 6 months, she met with Thras.io's CEO, Defendant Silberstein.  Ms. Hoffman and Defendant Silberstein agreed that the Company would set her grant at $1.2 million, with 6 months vested for her work from May 1, 2019 through October 31, 2019, for a grant of $150,000 in equity.  Ms. Hoffman and Defendant Silberstein agreed that the grant would be "trued up" to reflect that the grant was based on the Company's Q1 valuation and that the Company's value had significantly increased during Ms. Hoffman's 6 months of service.

4.     In the months that followed, Defendant Silberstein repeatedly confirmed this agreement both orally and in writing, but the Company failed to issue the equity.  Recently, after its valuation soared to $1 billion, the Company reneged on the agreement altogether and stated that it "no longer" trued up employee equity grants.  As a result of Defendants' wrongdoing, Ms. Hoffman has lost millions of dollars and is entitled to recover the full value of her Thras.io equity, multiple damages and attorneys' fees.

## PARTIES

5.     Sasha Hoffman is an individual residing in Los Angeles, California.

2

6.      Thras.io, Inc. is a Delaware corporation with a principal place of business in Walpole, Norfolk County, Massachusetts.

7.      Joshua Silberstein is an individual residing, on information and belief, in New York, New York.  Silberstein is a Co-Chief Executive Officer, a member of the Board of Directors and Co-Founder of Thras.io.

8.      Carlos Cashman is an individual residing, on information and belief, in Dover, Norfolk County, Massachusetts.  Cashman is a Co-Chief Executive Officer, a member of the Board of Directors and Co-Founder at Thras.io.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Defendants pursuant to G.L. c. 223A, § 2 because Defendants live or have a place of business in Massachusetts.

10.     Venue is proper in this Court pursuant to G.L. c. 223, § 1 because one or more of the parties lives or has a place of business in Norfolk County.

## FACTS

### The Defendants Recruit Ms. Hoffman

11.     In or about 2018, Defendants Joshua Silberstein and Carlos Cashman founded Defendant Thras.io.

12.     Thras.io is the largest acquirer of Amazon businesses and one of the top 25 sellers on Amazon.  The startup acquires category-leading Amazon third-party private label businesses, and then onboards, optimizes, and operates those brands.

13.     Silberstein and Cashman are co-Chief Executive Officers and co-founders of Thras.io.  They are also both Directors of the Company.  Both Silberstein and Cashman are in

charge of managing Thras.io and substantially participate in formulating corporate policy for Thras.io, including making decisions regarding retention and compensation of employees.

14.     In late January 2019, a mutual acquaintance introduced Ms. Hoffman to Defendant Cashman.  Defendants were interested in recruiting Ms. Hoffman to join their start-up because of her unique skill set, developed as a former investment banker with Barclays and Goldman Sachs, Head of Business Development for then start-up Plastiq, and former COO of Piaggio Fast Forward.  Ms. Hoffman's extensive executive management experience for multiple start-ups made her the right person to help Thras.io develop and grow from an early stage start-up into a successful business.

15.     As of the introduction to Ms. Hoffman in January 2019, Thras.io, as an early stage start-up, had raised only modest capital from the founders and angel investors.

16.     In or about March or April 2019, Thras.io closed a seed round of financing in which the Company raised $6.5 million.  Upon information and belief, the Company valuation was approximately $22 million and the shares of the Company's stock were valued at no more than $1.00 per share.

17.     Over the course of Q1 2019, in meetings, calls and correspondence, Cashman and Silberstein recruited Ms. Hoffman to join Thras.io as a core member of the management team, to serve in a senior management role.  Cashman and Silberstein introduced Ms. Hoffman to the other members of Thras.io's senior management team, who all interviewed her before she started work at Thras.io.

18.     Because Thras.io was an early stage start-up at the time, it had limited cash resources and its long term prospects were uncertain.  Silberstein specifically represented to Ms.

Hoffman that Thras.io was paying most of the compensation to its senior management in the form of equity grants.

19.     The primary reason Ms. Hoffman was willing to consider working for Thras.io was Silberstein and Cashman's repeated assurance that she would receive a substantial equity stake in the Company if she would work with them.  Silberstein and Cashman told her they were aiming for a $1 billion valuation.  If the Company succeeded, early stage equity offered her the opportunity for substantial wealth creation.

**Defendants Entice Ms. Hoffman with Equity**

20.     Accordingly, as a significant inducement for Ms. Hoffman to agree to work for Thras.io, Defendants committed to provide Ms. Hoffman with a substantial grant of Thras.io equity of between $1 million and $2 million at the Q1 2019 valuation, which was no more than $1.00 per share.  Over the course of numerous conversations between January 2019 and May 2019, Defendants Cashman and Silberstein repeatedly and explicitly assured Hoffman that if she would work with them, she would receive this equity in Thras.io.

21.     When she started work for Thras.io, Defendants Silberstein and Cashman told Ms. Hoffman that the paperwork confirming her equity would be issued later and that all of Thras.io's employees were currently waiting for their equity grants because the Company did not have a current, valid 409A valuation in order to set the exercise price.

22.     This representation, upon information and belief, was knowingly false and fraudulent.

23.     It appeared true, however, that other employees were also being kept waiting for their equity grants, and so Ms. Hoffman's reliance on the Defendants' representations was reasonable.

24.     The Defendants repeatedly assured Ms. Hoffman in multiple conversations both before and after she agreed to come to work for Thras.io that:  (1) as soon as they had a 409A valuation, they would issue her equity grant; (2) her grant would be "trued up" to be based on the valuation from Q1 2019; and (3) her vesting would begin on May 1, 2019 and she would be vested based upon a 4-year vesting schedule from that date regardless of whether she agreed to take a long-term position at Thras.io or not.

25.     In reliance on the numerous representations by both Defendant Silberstein and Defendant Cashman that she would receive this equity in the Company, Ms. Hoffman agreed to begin work at Thras.io and continued to work there over the months that followed, including agreeing repeatedly to extend her "consultant agreement" and sign a non-disclosure agreement (the "NDA") which designated her as an employee.

26.     On information and belief, based upon the Defendants' conduct and the related facts described herein, the Defendants made knowing and intentional misrepresentations to Ms. Hoffman concerning the reason for not issuing her the equity grant they repeatedly promised her, based upon which it is fair to infer that at all times, the Defendants secretly did not intend to issue the equity to Ms. Hoffman as they promised.

27.     Silberstein personally made these promises and misrepresentations concerning the equity grant throughout the course of recruiting Ms. Hoffman and throughout her tenure at Thras.io, including each time she agreed to extend the period during which she would work for Thras.io and in order to induce her to sign the NDA.  In reliance on Defendants' promises that she would receive a substantial grant of Thras.io equity, Ms. Hoffman worked for Thras.io and devoted her full-time, best efforts to the business of the Company, while passing up other lucrative opportunities to work for other companies.

6

**The Purported "Consulting Agreement"**

28.     When Ms. Hoffman agreed to come to work for Thras.io, the Parties agreed that they would engage in a three-month trial period to see if Ms. Hoffman was a good fit with Thras.io, and whether a long-term, senior management role at Thras.io was mutually agreeable.

29.     Although the Defendants made clear to Ms. Hoffman that she was required to devote her full-time efforts to Thras.io and could not pursue any outside opportunities while she was working for them, they had her sign a "consulting agreement," which purported to designate her as an independent contractor.

30.     The Parties at all relevant times expected and understood that Ms. Hoffman's work for Thras.io would be largely the same both before and after the trial period.

31.     The Consulting Agreement describes the work Ms. Hoffman was retained to perform as including to: (a) understand the organizational goals for various departments of Thras.io; (b) conduct organizational infrastructure analysis to determine strong and challenging areas in Thras.io and make recommendations; and (c) identify methods, including software, to help Thras.io accomplish the identified goals.

32.     The Consulting Agreement explicitly states that Ms. Hoffman would "report to" an officer designated by Thras.io.  The Agreement also requires Ms. Hoffman to perform services "in conformity in all respects with all requirements or specifications stated by the Company."

33.     Ms. Hoffman represented by signing the Consulting Agreement that she was not under any other obligations that could conflict with her work for Thras.io.  The Agreement explains that such a conflict would arise by engaging in activities for another company that "earns its primary source of revenue from an online (internet) behavioral advertising network

7

that uses targeting algorithms based on data derived from consumer visitation patterns to Internet sites."

34.     The term of the Agreement was between May 1, 2019 and July 31, 2019, but Ms. Hoffman later agreed to extend it in reliance on the Defendants' promises and representations concerning the Thras.io equity grant.

**Ms. Hoffman's Work at Thras.io**

35.     During her employment by Thras.io as a purported consultant, Ms. Hoffman functioned as if she were a member of the Company's senior management.

36.     At all times during her employment by Thras.io, she worked full time for the Company, functioned as a senior executive, reported directly to Silberstein and Cashman, worked long hours, worked exclusively for Thras.io and at all times was subject to their direction and control in the performance of her duties.  She frequently worked in excess of 40 hours per week and devoted significant portions of her personal time to Thras.io.

37.     At all times while Ms. Hoffman was employed by Thras.io as a purported consultant, the work she did for the Company was part of its usual course of business.  She participated in weekly senior management calls, attended senior management offsite meetings, and consistently worked as a member of the senior management team.

38.     Thras.io assigned Ms. Hoffman a company email address, sasha@thras.io, and gave her a Company computer.  She had keys to the Company offices in New York (WeWork) and Massachusetts.

39.     Substantial written correspondence among the Parties supporting Ms. Hoffman's claims took place through her Company email address, using a Company computer and, therefore, is in the possession, custody and control of the Defendants.

40.     Ms. Hoffman's work at Thras.io was highly successful.  Among other things, Ms. Hoffman recruited, interviewed and hired new employees, wrote employee job descriptions, established onboarding procedures for new employees, and participated in their onboarding.

41.     Ms. Hoffman optimized the Company work flow that allowed Thras.io to buy multiple companies per quarter.  She established a standardized due diligence documentation process, standardized and optimized how those newly acquired companies were onboarded into Thras.io and set the Company up for success.  Ms. Hoffman also designed and rolled out a playbook of hundreds of tasks to be performed for every newly acquired company in order to clean up its business, bring it up to Thras.io standards, and drive top-line growth.  Upon information and belief, Thras.io uses Ms. Hoffman's playbook to this day.

42.     At no time during her employment by Thras.io as a purported consultant did Ms. Hoffman engage in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed, and the Defendants specifically told her such outside work was forbidden while working for Thras.io.

43.     Ms. Hoffman performed her work for Thras.io using Thras.io resources.

44.     While working for Thras.io, Ms. Hoffman did not pursue or accept work with any other entities.

45.     At all relevant times, Silberstein and Cashman controlled all decisions with respect to Ms. Hoffman's retention and compensation and were the primary individuals at Thras.io who communicated with her regarding same.

46.     The Defendants misclassified Ms. Hoffman as an independent contractor.  At all times, Ms. Hoffman was an employee of Thras.io under applicable Massachusetts law.

**Defendants Induce Ms. Hoffman to Continue Providing Services Beyond the Initial Term**

47.     When the Consulting Agreement ended on July 31, 2019, the parties agreed that Ms. Hoffman would continue to work for Thras.io as they worked out the details of her long-term role.

48.     On or about August 1, 2019, the Parties executed a new "Consulting Agreement," and the Defendants required Ms. Hoffman to sign an NDA.

49.     As an inducement to sign these documents, the Defendants reiterated their promise to Ms. Hoffman that she would receive her equity grant as soon as a valid 409A valuation for the Company was available.  They again represented that the equity would be priced and trued up based upon the Q1 2019 valuation.

50.     Ms. Hoffman made the decisions to continue to work for Thras.io and sign the NDA based on Defendants' promises that she would receive the promised equity grant as soon as the Company had a valid 409A valuation.

51.     Again, upon information and belief based on the events outlined in this Complaint, these representations to Ms. Hoffman were knowingly false and fraudulent.

52.     In August 2019, Ms. Hoffman became aware that other Thras.io employees were receiving their equity grants.  When she asked the Defendants for her grant, they told her it would be "easier" to roll the grant into her long-term contract or provide it at her departure from the Company.  They specifically and explicitly committed to Ms. Hoffman that she would receive this equity regardless of whether she took on a long-term role with the Company.

53.     Upon information and belief, the Defendants again knowingly and intentionally made misrepresentations to Ms. Hoffman, intending to string her along and induce her to continue to work for Thras.io.

54.     In reliance on Defendants' repeated promises that she would receive the promised equity ownership in Thras.io, Ms. Hoffman signed the NDA and continued working for Thras.io through October 31, 2019.

**Ms. Hoffman's Departure from Thras.io**

55.     In October 2019, the Parties agreed that Ms. Hoffman would not take on a long-term position with the Company and that she would stop providing services to Thras.io as of October 31, 2019.

56.     On October 30, 2019, Ms. Hoffman met with Silberstein at Thrasio's New York office to discuss the terms of her departure from Thras.io and the terms of her equity grant.

57.     During that October 30, 2019 meeting, Defendant Silberstein and Ms. Hoffman discussed the specifics of her equity grant from Thras.io and agreed on all material terms of the grant.

58.     Silberstein acknowledged that they had agreed that the Company would grant Ms. Hoffman between $1 million and $2 million in equity based upon the Q1 2019 valuation to vest over 4 years commencing May 1, 2019 and that she had worked for the Company for 6 months.

59.     During the October 30, 2019 meeting, Defendant Silberstein and Ms. Hoffman accordingly agreed that the grant would be based upon a total grant of $1.2 million in equity over the four-year vesting schedule.  Because she had worked for Thras.io for 6 months, that meant that she was entitled to $150,000 in Thras.io equity, pegged to the valuation when she started, which was no more than $1.00 per share.

60.     Defendant Silberstein again represented to Ms. Hoffman that as soon as the Company had a valid 409A valuation, the Company would issue her the equity as agreed during the October 30, 2019 meeting.

11

61.     During the October 30, 2019 meeting, Silberstein specifically and explicitly agreed that Thras.io would "true up" Ms. Hoffman to reflect the Q1 2019 valuation when she had joined the Company to ensure that she received the full value of the equity promised her and the full benefit of the increased value of the Company during the time she worked for it.

**The Increased Value of Thras.io and its Stock**

62.     In part due to Ms. Hoffman's work for Thras.io, the Company's value soared during the months she worked for it and in the months that followed.

63.     On or about November 27, 2019, the Company announced the closing of a $20 million Series A financing round.  In its press release, the Company stated that its valuation had increased 8.6 times between April 2019 and November 2019 – almost precisely paralleling Ms. Hoffman's tenure with the Company.

64.     In the November 27, 2019 press release, the Company specifically touted the manner in which it could "seamlessly onboard new companies and firm up operations through expertise in brand management optimization, product development and supply chain management, delivering day to day growth."  These processes are right out of the playbook Ms. Hoffman created for Thras.io.

65.     The Company's value has continued to soar.  On or about April 10, 2020, Thras.io announced the closing of a Series B financing round, in which the Company raised over $100 million.  In its press release, the Company disclosed that the Series B Round valuation was "over $700mm - a 32x increase in valuation in the last 12 months (since the March '19 Series Seed financing)."  Contemporaneous financial news pegged the actual valuation for the Series B Round at $780 million.

66.    On or about July 15, 2020, the Company announced that it had closed a Series C financing round, in which it raised $260 million with a valuation of $1 billion – nearly 50 times the valuation upon which Ms. Hoffman's promised equity grant was based.

67.    Even as the Company's valuation soared, Defendant Silberstein affirmed both in telephone conversations and in emails the terms of the Parties' agreement with regard to Ms. Hoffman's equity grant.

68.    For example, on January 7, 2020, Defendant Silberstein confirmed in an email that: "The valuation has not yet been completed - it is in process.  We had a second close on the financing in mid-December.  Once the valuation is completed, we'll know what the strike price is for the updated shares, and can explore how much impact that has on the overall grant."

69.    On March 15, 2020, Defendant Silberstein represented in an email that: "It is relatively unusual to close a round in November/December and have another capital raise process start in February (and that was not the original intention), but we now need to wait until we conclude the new financing before we can issue new options / shares.  I'm happy to hop on a call and walk you through the dynamics, but the bottom line is that if I were to issue you options right now you'd potentially have a significant tax liability if the strike price turned out to be lower than where the 409(a) eventually places the valuation."

70.    On April 10, 2020, Defendant Silberstein confirmed in an email that: "The grant will be pegged to the fmv at the time we discussed it, not the 409(a). That's how we do it for everyone. Grants are never made based on 409(a) values - that just sets the exercise price.  If you want non-quals that's fine. We can discuss true-up mechanics... there is more than one way to accomplish that."

71.     On April 14, 2020, Defendant Silberstein again confirmed in an email that: "As I mentioned before, we can't do anything until we have a new valid 409(a). The recent round invalidates the old one.  The quantum of shares won't change. The exercise price will, but it should amount to a rounding error in the long run. We can discuss what protections are appropriate to keep your economics unaffected."

72.     On June 5, 2020, Defendant Silberstein also expressly confirmed the terms of the equity grant to Ms. Hoffman in a telephone call.

73.     Then, on July 27, 2020 (after the Company achieved a $1 billion valuation), Thras.io, in an email from its general counsel, Michael Fahey, reneged on the agreement between the Parties, stating:  "Since the time of your original conversations with Josh, we have decided against affecting 'true-ups' such as you are suggesting."  Mr. Fahey's correspondence openly admits the terms of the agreement with Ms. Hoffman which the Company now refused to honor.

74.     On information and belief, the Company is refusing to honor the agreement it made with Ms. Hoffman because the value of Ms. Hoffman's equity grant has increased so much since her start date, May 1, 2019.

75.     In round numbers, where the value of the Company has increased approximately 50 times since Q1 2019, her equity grant is now worth approximately $7.5 million.

76.     This actualization of the potential value of the stock promised her is exactly the reason that a seasoned executive such as Ms. Hoffman agrees to work for an early stage start-up such as Thras.io.  Ms. Hoffman would never have agreed to work for Thras.io at all without the promised equity grant.  The wealth creation represented by the increase in the valuation of Thras.io is exactly the benefit of the bargain that Ms. Hoffman made with the Defendants.

77.     In addition to not receiving the equity grant, because Defendants misclassified Ms. Hoffman as an independent contractor throughout the six months she worked there, Ms. Hoffman did not receive any of the customary benefits of employment received by other Thras.io employees.

78.     On August 10, 2020, the Massachusetts Attorney General's Office ("AGO") issued to Ms. Hoffman a right-to-sue letter, a true copy of which is attached hereto as **Exhibit 1**.

## COUNT I – UNLAWFUL MISCLASSIFICATION OF MS. HOFFMAN AS AN INDEPENDENT CONTRACTOR UNDER G.L. c. 149, §§ 148B & 150
### (Hoffman v. All Defendants)

79.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

80.     Ms. Hoffman is presumed to be an employee under Massachusetts law.

81.     By misclassifying Ms. Hoffman as an independent contractor and failing to pay her wages and benefits as an employee, the Defendants have violated M.G.L. ch. 149, § 148B.

82.     Defendants cannot show that they properly characterized Ms. Hoffman as an independent contractor because: (a) Ms. Hoffman performed services under Defendants' direction and control; (b) all of Ms. Hoffman's services, which she performed using Thras.io's resources, were an essential part of Defendants' business; and (c) the Consulting Agreement prohibited Ms. Hoffman from engaging in competing obligations, and she devoted all of her time to Thras.io.

83.     Silberstein and Cashman are personally liable for Thras.io's misclassification of Ms. Hoffman because they, at all relevant times, have been co-CEOs of Thras.io and, on information and belief, have control over the management of Thras.io, substantially participate in formulating its corporate policy, and control its employment and compensation decisions.

84.     In addition, Silberstein and Cashman specifically controlled and directed the decisions surrounding Ms. Hoffman's employment and the payment of Ms. Hoffman's compensation such that they are liable for the violations described herein.

85.     Ms. Hoffman is entitled to recover as damages for misclassification of her as an independent contractor an amount to be determined at trial sufficient to compensate her for all wages and benefits unlawfully denied to her as a result of this misclassification, including, but not limited to, the full value of the promised Thras.io equity grant.

86.     Ms. Hoffman is also entitled to recover treble damages and attorneys' fees and costs pursuant to G.L. c. 149, § 150.

87.     The Court should declare the Consulting Agreement void *ab initio* for misclassification of Ms. Hoffman in violation of Massachusetts law, and award her damages in an amount to compensate her for all of her losses, treble damages, attorneys' fees, interest, costs, injunctive and such other and further relief as the Court deems just.

88.     The Court should enjoin the Defendants from misclassifying its employees in the future.

## COUNT II – FRAUD
### (Hoffman v. All Defendants)

89.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

90.     Defendants Silberstein and Cashman knowingly and intentionally misrepresented to Ms. Hoffman that the delay in issuing her equity grant was the result of the need for a current 409A valuation.

91.     Defendants Silberstein and Cashman each personally made those representations directly to Ms. Hoffman repeatedly on multiple occasions over a period of months between January 2019 and October 2019.

92.     In the months following October 2019, Silberstein and Cashman have acknowledged those promises and the agreement reached on October 31, 2019 repeatedly, in writing, in electronic mail, including but not limited to in emails dated January 7, March 15, April 10 and April 14, 2020.

93.     On information and belief, based upon the facts recited above, Defendants knew that their representations were false and/or knew that they had no reasonable basis for making those material misrepresentations because, at the time they made the misrepresentations, they did not intend to grant any stock options to Ms. Hoffman.

94.     Defendants knowingly made the false representations intending for Ms. Hoffman to rely on them and for the purpose of inducing Ms. Hoffman to agree to perform valuable services for Defendants.

95.     Defendants knew that the promise of receiving stock in Thras.io, then a promising start-up positioned for rapid growth, was a material consideration with respect to Ms. Hoffman's decision to perform services for Defendants.

96.     Ms. Hoffman reasonably relied on Defendants' representations and acted upon them to her detriment by signing the Consulting Agreement, performing services exclusively for Thras.io for six months, and foregoing alternative arrangements.

97.     Ms. Hoffman has been damaged by Defendants' fraud in an amount to be determined at trial.

## COUNT III – VIOLATIONS OF THE SECURITIES EXCHANGE ACT, 15 U.S.C. §78j(b)
### (Hoffman v. All Defendants)

98.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

99.     Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, in that, as described herein, and in

connection with the purchase, offer and sale of securities, they knowingly, recklessly and intentionally:

a)  Employed manipulative and deceptive devices and contrivances;
b)  Employed devices, schemes and artifices to defraud;
c)  Made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and
d)  Engaged in acts, practices and a course of business which operated as a fraud or deceit upon the Plaintiff.

100.    Specifically, Defendants agreed to grant Ms. Hoffman Thras.io equity at the Q1 2019 valuation, while, on information and belief, secretly intending, at the time they made the promise, not to honor that obligation.

101.    Defendants' secret intention is evidenced by their repeated false explanations for their failure to perform, and specifically by their assertion that a new 409A valuation was necessary when that assertion was false and they knew or should have known that based upon their positions at Thras.io and their detailed inside knowledge.  Defendants claimed not to have the information needed to issue the option to Ms. Hoffman, yet they contemporaneously issued stock options to other Thras.io employees.

102.    Defendants' conduct was misleading because Ms. Hoffman presumed Defendants were acting in good faith when they promised to grant her the option.  Defendants also misled Ms. Hoffman as to the value of the option because, with no intention to ever grant it, the option was valueless.

103.    Ms. Hoffman reasonably relied on Defendants' promise to grant the option by signing the Consulting Agreement, performing services exclusively for Thras.io for six months, and foregoing alternative arrangements.

104.    Silberstein and Cashman are personally liable under 15 U.S.C. § 78t because they controlled Thras.io as its co-CEOs, made the misrepresentations to Ms. Hoffman personally, and did not act in good faith when they promised to grant an option they did not intend to grant.

105.    As a direct and proximate cause of the violations of the federal securities laws by the Defendants, Ms. Hoffman has suffered damages in an amount to be determined at trial.

## COUNT IV – BREACH OF CONTRACT
### (Hoffman v. Thras.io)

106.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

107.    Ms. Hoffman and Thras.io are parties to an enforceable contract.

108.    Pursuant to that contract, Thras.io agreed to grant Ms. Hoffman $150,000 in Thras.io equity at the Q1 2019 valuation, trued up to the date of the grant so that the value of the grant reflected the increased Company value since Q1 2019.

109.    Thras.io has breached the contract by failing to issue the promised Thras.io equity to Ms. Hoffman.

110.    As a result of Thras.io's breach of contract, Ms. Hoffman has suffered damages in an amount to be determined at trial.

## COUNT V – PROMISSORY ESTOPPEL
### (Hoffman v. Thras.io)

111.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

112.    Thras.io, through its co-CEOs Silberstein and Cashman, made repeated representations to Ms. Hoffman that Thras.io would grant Ms. Hoffman Thras.io equity, and specifically agreed to the precise terms of the grant on October 31, 2019, after Ms. Hoffman worked for months in reasonable reliance on their promises.

113.    Defendants made numerous, specific, clear, precise and convincing representations intending thereby to induce Ms. Hoffman to provide services to Thras.io, which work was highly valuable to Defendants.

114.    Ms. Hoffman reasonably and detrimentally relied on those clear, precise and convincing representations by serving as a senior executive and for months as Thras.io's *de facto* chief operating officer, performing services exclusively for Thras.io for six months, and foregoing alternative arrangements and opportunities.

115.    Justice requires that the Court enforce the Defendants' promises.

### COUNT VI:  VIOLATION OF CHAPTER 93A, § 11 (Alternative Claim)
### (Hoffman v. All Defendants)

116.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

117.    As set forth herein, if the Court for some reason finds that Ms. Hoffman was not misclassified as an independent contractor and should not be deemed an employee, then the parties were engaged in trade or commerce within the meaning of G.L. c. 93A, § 11.

118.    Defendants' conduct, as set forth herein, constitutes an unfair or deceptive trade practice in violation of Chapter 93A.  Specifically, Defendants made false representations concerning their intention to issue Ms. Hoffman equity in Thras.io in order to induce her to perform valuable services for Thras.io.  Defendants continued to make false assurances of payment throughout the six months that Ms. Hoffman was providing services, thereby stringing her along, inducing her to continue providing services even beyond the initial term of the Consulting Agreement, and giving her no reason to believe that Defendants did not intend to honor their promise.

119.    When questioned about the status of the option following Ms. Hoffman's departure, Defendants proffered false, pretextual reasons for the failure to issue the equity only to

repudiate the agreement among the Parties after the Company succeeded, achieved a $1 billion valuation, and the fruits of the agreement were realized.

120.     Defendants' violation of Chapter 93A is knowing and willful, as a result of which Ms. Hoffman is entitled to treble damages.

121.     The conduct violating Chapter 93A took place primarily and substantially in Massachusetts.

122.     Silberstein and Cashman personally participated in Thras.io's Chapter 93A violations by making the misrepresentations described herein and making the decision to repudiate their agreement with Ms. Hoffman after the Company succeeded.

123.     As a direct and proximate result of Defendants' unfair and deceptive trade practices, Ms. Hoffman has suffered damages in an amount to be determined at trial.

WHEREFORE, the Plaintiff, Sasha Hoffman, prays that the Court:

A.  Enter judgment in her favor and against Defendants on all Counts of the Complaint;

B.  Enter a judgment of treble damages against Defendants pursuant to G.L. c. 149, § 150 or G.L. c. 93A;

C.  Award damages, including interest, costs, and attorneys' fees, in an amount to be determined at trial;

D.  Enjoin the Defendants from further violations of the Wage Act; and

E.  Grant Plaintiff such other and further relief as is just or appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

Respectfully submitted,

Plaintiff,

SASHA HOFFMAN,

By her attorneys,

_____

Sean T. Carnathan (BBO # 636889)
scarnathan@ocmlaw.net
Stephanie R. Parker (BBO# 687610)
sparker@ocmlaw.net
O'Connor Carnathan and Mack LLC
1 Van de Graaff Drive, Suite 104
Burlington, Massachusetts 01803
Tel. 781-359-9000

Dated: November 17, 2020

# EXHIBIT 1



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MAURA HEALEY
ATTORNEY GENERAL

(617) 727-2200
(617) 727-4765 TTY
www.mass.gov/ago

August 10, 2020

Attorney Nicole Corvini
Beck Reed Riden, LLP
155 Federal Street, Suite 1302
Boston, MA 02110

RE:   Sasha Hoffman
        Request for Private Right of Action against Thras.io, Inc.

Dear Attorney Corvini:

Thank you for contacting the Office of the Attorney General's Fair Labor Division.

Massachusetts General Laws Chapter 149, § 150, and Chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws.

This letter is to inform you that we are authorizing you to pursue this matter through a private civil lawsuit.  If you elect to sue in civil court, you may bring an action on your own or your clients' behalf, and on behalf of other similarly situated workers.

This office will not pursue an investigation or enforcement at this time.

Sincerely,

Fair Labor Division
Office of Attorney General Maura Healey
(617) 727-3465