UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SASHA HOFFMAN,<br><br>Plaintiff,<br><br>v.<br><br>THRAS.IO, INC., JOSHUA SILBERSTEIN, and CARLOS CASHMAN,<br><br>Defendants. | C.A. No. 1:20-cv-12224-PBS |

**PLAINTIFF'S MEMORANDUM IN**
**<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

Sean T. Carnathan (BBO # 636889)
Stephanie R. Parker (BBO# 687610)
O'Connor Carnathan and Mack LLC
1 Van de Graaff Drive, Suite 104
Burlington, Massachusetts 01803
Tel. 781-359-9000
scarnathan@ocmlaw.net
sparker@ocmlaw.net

*Counsel for Plaintiff Sasha Hoffman*

TABLE OF AUTHORITIES ..................... ii

INTRODUCTION ..................... 1

FACTS ALLEGED IN THE COMPLAINT ..................... 1

ARGUMENT ..................... 5

I. Legal Standard ..................... 5

II. The Law Affords a Remedy to an Employee Plainly Misclassified as an Independent Contractor and Who Was Victimized by False Promises. ..................... 5

A. Defendants Are Strictly Liable to Hoffman for All Damages Suffered Due to her Misclassification as an Independent Contractor. ..................... 6

B. Defendants' Misclassification Renders the Consulting Agreement Void. ..................... 8

C. Hoffman's Specific Allegations of False Statements by Cashman and Silberstein State Actionable Claims for Fraud. ..................... 9

D. Hoffman "Purchased" Securities through her Labor, and Defendants Who Promise Securities with a Secret Intention Not to Deliver Are Liable for Securities Fraud Under Section 10(b) of the '34 Act. ..................... 12

E. The Unlawful Consulting Agreement Cannot Shield Defendants From Honoring their Oral Contract with Hoffman to Grant her Equity. ..................... 13

F. Hoffman Reasonably Relied on Cashman's and Silberstein's Promises, and the Consulting Agreement is No Bar to Her Claim for Promissory Estoppel. ..................... 18

G. Making False Promises to Secure Services and Denying Known Obligations in Bad Faith is Unfair and Deceptive Conduct in Violation of Chapter 93A. ..................... 20

CONCLUSION ..................... 20

# TABLE OF AUTHORITIES

**Cases (Federal)**

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002) ........ 10

*Arabian Support & Servs. Co., Ltd. v. Textron Sys. Corp.*, 368 F. Supp. 3d 211 (D. Mass. 2019) ........ 18

*Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47 (1st Cir. 1998) ........ 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........ 5

*Beck v. Mass. Bay Techs., Inc.*, 2017 U.S. Dist. LEXIS 215357 (D. Mass. Sept. 6, 2017) ........ 6

*Berezin v. Regency Sav. Bank*, 234 F.3d 68 (1st Cir. 2000) ........ 5

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ........ 12

*Brand Group Int'l, LLC v. Established Brands Int'l*, 2011 U.S. Dist. LEXIS 81507 (D. Mass. July 26, 2011) ........ 20

*CardiAQ Valve Techs., Inc. v. Neovasc, Inc.*, 57 F. Supp. 3d 118 (D. Mass. 2014) ........ 9

*Christian v. Transperfect Global, Inc.*, 2018 U.S. Dist. LEXIS 162833 (S.D.N.Y. Sept. 24, 2018) ........ 16

*Citibank, N.A. v. Najda*, 2016 U.S. Dist. LEXIS 4167 (D. Mass. Jan. 13, 2016) ........ 18

*Crisp Human Capital Ltd. v. Authoria Inc.*, 613 F. Supp. 2d 136 (D. Mass. 2009) ........ 12

*Desert Land, LLC v. Owens Fin. Grp., Inc.*, 154 Fed. Appx. 586 (9th Cir. 2005) ........ 13

*Ferrara v. Voyport II, LLC*, 2018 U.S. Dist. LEXIS 184772 (D. Mass. Oct. 29, 2018) ........ 6

*Fin Brand Positioning, LLC v. Take 2 Dough Prods.*, 2011 U.S. Dist. LEXIS 140273 (D.N.H. Dec. 6, 2011) ........ 18

*Fine v. Guardian Life Ins. Co. of Am.*, 450 F. Supp. 3d 20 (D. Mass. 2020) ........ 8

*First Marblehead Corp. v. House*, 473 F.3d 1 (1st Cir. 2006) ........ 15

*Fraser v. Fiduciary Trust Co. Int'l*, 417 F. Supp. 2d 310 (S.D.N.Y. 2006) ........ 13

*Geis v. Nestlé Waters North America, Inc.*, 321 F. Supp. 3d 230 (D. Mass. 2018) ........ 14

*Gupta v. Cisco Sys.*, 274 F.3d 1 (1st Cir. 2001) ........ 14

*IDT Corp. v. eGlobe Inc.*, 140 F. Supp. 2d 30 (D.D.C. 2001) .......... 13

*In re Bank of Bos. Corp. Sec. Litig.*, 762 F. Supp. 1525 (D. Mass. 1991) .......... 13

*In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir. 2002) .......... 9

*In re Cendant Corp. Sec. Litig.*, 81 F. Supp. 2d 550 (D.N.J. 2000) .......... 13

*MBIA Insurance Corp. v. Spiegel Holdings, Inc.*,
2004 U.S. Dist. LEXIS 17484 (Aug. 27, 2004) .......... 13

*McMahon v. Digital Equipment Corp.*, 162 F.3d 28 (1st Cir. 1998) .......... 18

*Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197 (1st Cir. 2004) .......... 19

*Ramos v. White (In re Ramos)*, 2020 Bankr. LEXIS 2341 (D. Mass. Bankr. Sept. 2, 2020) .......... 16

*Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5 (1st Cir. 2004) .......... 12

*Santos v. Flanagan*, 942 F. Supp. 2d 178 (D. Mass. 2013) .......... 8

*The Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 590-91 (2001) .......... 12, 13

*Trifiro v. New York Life Insurance Co.*, 845 F.2d 30 (1st Cir. 1988) .......... 18

**Cases (State)**

*Anthony's Pier Four Inc. v. HBC Associates*, 411 Mass. 451 (1991) .......... 20

*Brown v. Nortel Networks*, 2002 Mass. Super. LEXIS 159
(Mass. Super. Ct. Apr. 25, 2002) .......... 7

*Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432 (1992) .......... 14

*Feldman v. Cutaia*, 956 A.2d 644 (Del. Ch. Ct. 2007) .......... 16

*In re Numida Corp.*, 2015 Del. LEXIS 562 (Del. Oct. 22, 2015) .......... 16, 17

*Jff Cecilia Llc v. Weiner Ventures*, 2020 Mass. Super. LEXIS 105
(Mass. Super. Ct. July 30, 2020) .......... 15

*Kalageorgi v. Victor Kamkin, Inc.*, 750 A.2d 531 (Del. Ch. Ct. 1999) .......... 18

*Kelly v. Nocion Therapeutics, Inc.*, 2020 Mass. Super. LEXIS 110
(Mass. Super. Ct. Mar. 3, 2020) .......... 13

*Knoll Capital Mgmt. L.P. v. Advaxis, Inc.*, 2016 Del. Ch. LEXIS 17
(Del. Ch. Ct. Jan. 11, 2016) .......... 17

*Marshall v. Stratus Pharms., Inc.*, 51 Mass. App. Ct. 667 (2001) ....21

*Masingill v. EMC Corp.*, 449 Mass. 532 (2007)....11

*McCarter & English, LLP v. PcVue, Inc.*, 2020 Mass. Super. LEXIS 17 (Mass. Super. Ct. Jan. 24, 2020)....20

*Mui v. Mass. Port Auth.*, 2015 Mass. Super. LEXIS 38 (Mass. Super. Ct. Apr. 1, 2015)....7

*Parris v. Sheriff of Suffolk County*, 93 Mass. App. Ct. 864 (2018) ....9

*Ramey v. Beta Bionics, Inc.*, 2020 Mass. Super. LEXIS 108 (Mass. Super. Ct. June 15, 2020)....11

*Reading & Language Learning Ctr. v. Sturgill*, 94 Va. Cir. 94 (Va. Cir. Ct. 2016) ....9

*S. Boston Betterment Trust Corp. v. Boston Redevelopment Auth.*, 438 Mass. 57 (2002) ....8

*Shawmut-Canton LLC v. Great Spring Waters of Am., Inc.*, 62 Mass. App. Ct. 330 (2004) ....11

*Slavin v. Xenon Corp.*, 1995 Mass. Super. LEXIS 813 (Mass. Super. Ct. Jan. 5, 1995)....9

*Somers v. Converged Access, Inc.*, 454 Mass. 582 (2009) ....6, 7, 8

*Starr v. Fordham*, 420 Mass. 178 (1995)....11

*Sullivan v. Sleepy's LLC*, 482 Mass. 227 (2019) ....7

*Tomer v. Hollister Assocs.*, 2006 Mass. Super. LEXIS 56 (Mass. Super. Ct. Jan. 17, 2006)....15

**Statutes and Rules**

15 U.S.C. § 78j(b)....12, 13

8 Del. C. § 157....15, 16

8 Del. C. § 204....17, 19

G.L. c. 93A, § 11....20

G.L. c. 149, § 148B....6

G.L. c. 149, § 150 ....7

G.L. c. 151, § 1A....7

Fed. R. Civ. P. 8....7

Fed. R. Civ. P. 12(b)(6) ............ 5, 21

Fed. R. Civ. P. 15 ............ 7

Fed. R. Evid. 201(d) ............ 16

## INTRODUCTION

In early 2019, Thras.io, Inc. ("Thras.io" or the "Company") was a recently formed start-up company hoping to position itself for rapid growth. Its co-founders and co-chief executive officers, Joshua Silberstein ("Silberstein") and Carlos Cashman ("Cashman") (together with Thras.io, "Defendants"), recruited Plaintiff Sasha Hoffman ("Hoffman" or "Plaintiff") to work for the Company. In order to induce Hoffman to join Thras.io, Defendants promised to issue her equity in Thras.io, tied to the valuation of the Company when she joined. Defendants repeated these promises on many occasions, and Hoffman relied on them to work exclusively for the Company. They induced her to sign an unlawful contract, misclassifying her as an "independent contractor" despite the fact that nothing about her role at the Company met the legal requirements to treat her that way. When Hoffman decided to leave, she and Silberstein met and nailed down the precise terms of the grant -- $150,000 in equity based on the share price when she joined the Company. Silberstein acknowledged the agreement in writing in multiple emails quoted in the Complaint, and the Company has more documents in its exclusive possession and control that reflect the promises of equity as well. In summer 2020, after Thras.io achieved a $1 billion valuation, making Hoffman's equity worth many times its original value, its general counsel e-mailed Hoffman and told her that Thras.io was reneging on its agreement. Defendants contend that Hoffman has no remedy for this unlawful, abusive conduct. They are wrong.

## FACTS ALLEGED IN THE COMPLAINT

In early 2019, Silberstein and Cashman began recruiting Hoffman to serve in a senior management role for their start-up, Thras.io, which was then less than a year old. Complaint ("Compl."), ¶¶ 11, 14, 17. Silberstein and Cashman co-founded Thrasio and served as co-CEOs and Directors of the Company. Id. ¶ 13. Silberstein and Cashman recruited Hoffman because

her past executive management experience for multiple start-ups made her the right person to help Thras.io rapidly grow into a successful business. Id. ¶ 14. By April 2019, Thras.io closed a $6.5 million seed round, in which its stock was valued at no more than $1.00 per share. Id. ¶ 16.

As an early-stage start-up, Thras.io had limited resources when it recruited Hoffman, and its long-term prospects were uncertain. Compl., ¶ 18. Silberstein specifically represented to Hoffman that Thras.io was paying most of the senior management compensation in the form of equity grants. Id. Silberstein and Cashman repeatedly assured Hoffman that, if she agreed to provide services for Thras.io, she would receive a substantial equity stake. Id. ¶ 19. Specifically, Defendants committed to provide Hoffman with a substantial grant of Thras.io equity of between $1 million and $2 million based on the company's valuation as of the first quarter of 2019 (no more than $1.00 per share). Id. ¶¶ 20, 24. Defendants promised that Hoffman would receive her equity regardless of whether she elected to stay with Thras.io long-term. Id. ¶ 24. Silberstein and Cashman made these promises to Hoffman repeatedly over the course of multiple conversations between January and May 2019. Id. ¶ 20. Defendants' promise of equity, which held the opportunity for substantial wealth creation if the Company succeeded, was the primary reason that Hoffman agreed to work for Thras.io. Id. ¶¶ 19, 25, 76.

At the time that Defendants promised to provide a substantial equity grant to Hoffman, they did not actually intend to honor that promise. Id. ¶ 26. Instead of disclosing their true intention with respect to not issuing the promised equity, Silberstein and Cashman repeatedly and falsely claimed that the delay in issuing the paperwork memorializing the grant was due to

the absence of a "409A valuation."[1] Id. ¶¶ 21, 22, 24, 26, 27, 60. Defendants proffered this false, pre-textual excuse on numerous occasions, including when Hoffman first started working for Thras.io, throughout her tenure at Thras.io, at the time of her departure, and following her departure. Id. The falsity of this excuse became clear when other Thras.io employees were issued equity at the same time that Defendants were claiming to not have the information needed to issue equity to Hoffman. Id. ¶ 52. When Hoffman confronted Defendants about this discrepancy, they claimed it would be easier to roll the equity grant into her long-term contract if she decided to stay, or, if she did not decide to stay, it would be issued at the time of her departure. Id. ¶ 52.

Hoffman believed that Defendants were acting in good faith and intended to honor their promise. See Compl., ¶ 27. Therefore, in May 2019, she signed a "Consulting Agreement," which purported to designate her as an independent contractor and which set forth the cash compensation she would receive for her services. Id. ¶ 29. The Consulting Agreement does not address equity grants and was intended to memorialize the cash payment terms for the trial period during which the parties would determine whether Hoffman was a good long-term fit for Thras.io. Id. ¶ 28; see also Exhibits A-D to Defendants' Memorandum.

After Hoffman's initial three-month term expired, Defendants reiterated their false promise of equity and pre-textual 409A excuse for delay in order to induce her to extend her **"consulting" services, as well as to induce her to agree to sign a non-disclosure agreement.**

[1] A 409A valuation sets the price of equity grants to employees to avoid tax liability for the employee at the time of the grant. Id. ¶ 2.

Compl., ¶¶ 25, 27, 34, 48-54. Hoffman, believing that Defendants would issue her the equity they promised, devoted her full-time, best efforts to Thras.io for six months. Id. ¶¶ 27, 54.

Although Defendants purported to designate Hoffman as an independent contractor, her work for Thras.io demonstrates that she was an employee. Hoffman devoted her full-time efforts to Thras.io and could not pursue outside opportunities while working for it. Compl., ¶¶ 27, 29, 33, 36, 42, 44, 46. She was required to report to a Thras.io employee and be subject to Thras.io requirements. Id. ¶¶ 32, 36. She provided services that were a part of Thras.io's usual course of business. Id. ¶ 37. She had a Thras.io e-mail address, company computer, and keys to the office. Id. ¶ 38. Hoffman performed her services using Thras.io resources. Id. ¶ 43. She frequently worked in excess of forty hours per week. Id. ¶ 36. The non-disclosure agreement that Defendants induced her to sign referred to her as an employee. Id. ¶ 25. Hoffman never received the customary employment benefits received by other Thras.io employees. Id. ¶ 77.

In October 2019, the parties agreed that Hoffman would leave Thras.io on October 31, 2019. Compl., ¶ 55. On October 30, 2019, Hoffman and Silberstein met to discuss the terms of her departure and equity grant. Id. ¶ 56. During that meeting, the parties agreed on all material terms of the equity grant. Id. ¶ 57. Specifically, Thras.io and Hoffman agreed that, based on the six months of services she had provided, she would receive a grant of $150,000 in equity, pegged to the valuation at the time she started, which was approximately $1.00 per share. Id. ¶ 59. Silberstein reiterated that Thras.io would "true up" Hoffman to reflect the Company's valuation as of the time he had first promised her the equity. Id. ¶ 61.

In the months following her departure, Silberstein continued, both in phone and e-mail communications, to confirm the terms of the parties' agreement and to falsely promise that Hoffman would receive equity and to claim that the delay was still a result of a purported lack of a 409A valuation. Compl., ¶¶ 67-72. For example, on April 10, 2020, Silberstein stated in an e-

mail to Hoffman that "**The grant will be pegged to the fmv at the time we discussed it . . . [w]e can discuss true-up mechanics** . . . there is more than one way to accomplish that." Id. ¶ 70 (emphasis added). On April 14, 2020, Silberstein confirmed that the "quantum of shares" would remain as promised. Id. ¶ 71. On July 27, 2020, however, after Thras.io had achieved a $1 billion valuation, its general counsel e-mailed Hoffman and expressly stated that Thras.io would not honor its agreement with Hoffman. See id. ¶ 73 ("Since the time of your original conversation with Josh, we have decided against affecting 'true-ups'").

## ARGUMENT

### I. Legal Standard

Rule 12(b)(6) requires that "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When assessing the sufficiency of a plaintiff's complaint, the court must accept the facts in the complaint as true and "draw every reasonable inference in [the plaintiff's] favor." Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000).

### II. The Law Affords a Remedy to an Employee Plainly Misclassified as an Independent Contractor and Who Was Victimized by False Promises.

The allegations in the Complaint establish blatant misclassification and documented false promises of equity, which the Company disavowed in writing after achieving the very success that persuaded Hoffman to work there. The Complaint properly states a claim in each count and the Defendants' motion should be denied.

**A. Defendants Are Strictly Liable to Hoffman for All Damages Suffered Due to her Misclassification as an Independent Contractor.**

The Massachusetts Independent Contractor statute, G.L. c. 149, § 148B ("Section 148B"), creates a presumption that an individual is an employee. See G.L. c. 149, § 148B ("an individual performing any service . . . shall be considered to be an employee"); Somers v. Converged Access, Inc., 454 Mass. 582, 588-91 (2009). Section 148B is a "strict liability statute . . . if an employer misclassifies an employee as an independent contractor, the employer must suffer the consequences." Somers, 454 Mass. at 591. A defendant who misclassifies a consultant as an independent contractor instead of an employee is liable under Section 148B. Ferrara v. Voyport II, LLC, 2018 U.S. Dist. LEXIS 184772, at *1, 9 (D. Mass. Oct. 29, 2018) (plaintiff, who signed a "Contractor-Consulting Agreement," was an independent contractor); Beck v. Mass. Bay Techs., Inc., 2017 U.S. Dist. LEXIS 215357, at *29-30 (D. Mass. Sept. 6, 2017) (finding consultant was an employee).

A defendant can only overcome the presumption of employment by demonstrating that all three of the following conditions exist: (a) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; (b) the service is performed outside the usual course of the business of the employer; and (c) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed. G.L. c. 149, § 148B. Defendants do not and cannot challenge the allegations supporting the conclusion that Hoffman was misclassified. Compl., ¶¶ 27, 29, 32-33, 36-38, 40-44, 46. Instead, they contend that Hoffman was obligated to plead her damages in much greater detail than the rules require. See Fed. R. Civ. P. 8.

Hoffman specifically alleges that her unlawful misclassification caused deprivation of wages and customary benefits of employment afforded to other employees. Compl., ¶¶ 77, 85; see G.L. c. 149, § 150 (misclassified employee may bring a civil action for injunctive relief and any damages incurred, including lost wages and other benefits); Somers, 454 Mass. at 584 & 594 ("[a]n employee misclassified as an independent contractor . . . [has] damages incurred equal [to] the value of wages and benefits he should have received as an employee, but did not"). Hoffman also alleges that she worked in excess of forty hours per week while at Thras.io, thereby implicating the overtime requirements of G.L. c. 151, § 1A. Compl., ¶ 36; see also Sullivan v. Sleepy's LLC, 482 Mass. 227, 235-37 (2019) (employers must make separate overtime payments). Fed. R. Civ. P. 8 requires nothing further.[2]

Defendants do not cite any binding authority for the contention that a vested, fully earned equity grant may never constitute wages under the Wage Act. Indeed, the Massachusetts Superior Court has previously denied a motion to dismiss a Wage Act claim based on promised stock options. See Brown v. Nortel Networks, 2002 Mass. Super. LEXIS 159, at *4 (Mass. Super. Ct. Apr. 25, 2002) (it was "premature at this procedural stage for a judicial determination on whether plaintiff's stock options, whether vested or unvested, are wages for the purposes of Wage Act protection"); see also Mui v. Mass. Port Auth., 2015 Mass. Super. LEXIS 38, at *7 (Mass. Super. Ct. Apr. 1, 2015) (denying motion to dismiss Wage Act claim based on unused

[2] To the extent that this Court finds that Hoffman's allegations in this regard are not detailed enough, the proper course is to permit Hoffman to amend her complaint to remedy such deficiency, not to dismiss her clearly viable claim for misclassification. Fed. R. Civ. P. 15. For example, the Defendants did not pay the employer share of Hoffman's payroll taxes, and she did not receive health insurance.

sick leave, citing Nortel). Fully earned equity should be recognized as a wage and any case to the contrary is wrongly decided.

Even if the Court were for some reason to conclude at this early stage that fully earned and vested equity is not a "wage," it should certainly be encompassed in Hoffman's damages as a "benefit," which is a recoverable element of damages for misclassification, separate and apart from the Wage Act. Somers, 454 Mass. at 584 & 594 ("damages incurred [for misclassification] equal **the value of wages and benefits** he should have received as an employee, but did not") (emphasis added); see M.G.L. ch. 149, § 150 (treble damages based on wages and benefits). During her tenure, the other Thras.io employees were receiving equity grants, just as was promised to Hoffman. Compl., ¶ 52. If not part of their wages, the equity was surely a substantial benefit. When Hoffman left Thras.io, her equity was fully earned and vested. Id. ¶¶ 3, 19-20, 24, 52, 55.[3] The equity is properly an element of her damages for misclassification.

**B. Defendants' Misclassification Renders the Consulting Agreement Void.**

Massachusetts courts decline to enforce contracts that are void because they violate public policy. See S. Boston Betterment Trust Corp. v. Boston Redevelopment Auth., 438 Mass. 57, 67, 69 (2002); Santos v. Flanagan, 942 F. Supp. 2d 178, 186 (D. Mass. 2013). Proper classification of workers and the prompt payment of employee wages are important public policies in the Commonwealth. Fine v. Guardian Life Ins. Co. of Am., 450 F. Supp. 3d 20, 31 (D. Mass. 2020) ("the Wage Act embodies fundamental public policy to protect employees'

---

[3] The fact that the calculation of Hoffman's equity was based on a total grant of $1.2 million with a four-year vesting schedule had she stayed with Thras.io does not change the analysis. When Hoffman left Thras.io, the parties calculated the percentage of equity she had already earned based on six months of work (6/48*$1,200,000 = $150,000). Defendants' reference to a "one-year cliff" is both wrong and outside the Complaint and must be disregarded.

compensation"); Parris v. Sheriff of Suffolk County, 93 Mass. App. Ct. 864, 870 (2018) (referencing Commonwealth's "fundamental public policy to provide strong statutory protection for employees and their right to wages"); Slavin v. Xenon Corp., 1995 Mass. Super. LEXIS 813, at *6 (Mass. Super. Ct. Jan. 5, 1995) ("the proper classification of workers as employees or independent contractors serves an important public policy"). Therefore, this Court should refuse to enforce a contract that misclassifies an employee. See Reading & Language Learning Ctr. v. Sturgill, 94 Va. Cir. 94, 107-08, 112 (Va. Cir. Ct. 2016) (referencing misclassification being a violation of Massachusetts public policy and finding agreement was void on grounds of misclassification). Hoffman suffered exactly the abuses from which Massachusetts law protects employees. Her Complaint alleges the Consulting Agreement is void and unenforceable, and all of her claims must be analyzed on the assumption she prevails on that allegation. Compl., ¶ 87.

### C. Hoffman's Specific Allegations of False Statements by Cashman and Silberstein State Actionable Claims for Fraud.

Hoffman has more than adequately alleged facts stating actionable claims for common law and securities fraud. See CardiAQ Valve Techs., Inc. v. Neovasc, Inc., 57 F. Supp. 3d 118, 123 (D. Mass. 2014) ("the elements of common law fraud in Massachusetts are (1) a false representation of a material fact, (2) made with knowledge of its falsity, (3) for the purpose of inducing a party to act thereon and (4) that the party relied upon the representation as true and acted upon it to its detriment"). Scienter for a federal securities claim may be demonstrated by indirect evidence and may extend to extreme recklessness. In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002). There is no rigid formula for alleging scienter, and assessing it requires a fact specific approach. Id. A plaintiff may combine various facts and circumstances to allege scienter. Id. at 39. An allegation that a defendant made a statement when he knew facts

suggesting that the statement was inaccurate or misleading is classic evidence of scienter. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002) (cited by Defendants).

Hoffman has specifically alleged exactly what Cashman and Silberstein represented to her, when they did so and the facts that support the inference that their representations were knowingly false. Cashman and Silberstein represented that: (1) Thras.io would issue equity to Hoffman, in the amount of $1 million to $2 million at the Q1 2019 valuation, with vesting to begin on May 1, 2019; and (2) the reason why there was a delay in issuing the paperwork memorializing the grant was that Defendants were waiting for a 409A valuation. Compl., ¶¶ 20-22, 24, 26-27, 60. The subsequent issuance of equity to other Thras.io employees, at the same time that Defendants continued to claim they did not have the information needed to issue Hoffman's paperwork, demonstrates that the proffered 409A excuse was not true. See id. at ¶¶ 52, 101. In turn, this false excuse for why the paperwork was delayed is itself evidence from which to infer that Defendants never intended to issue the promised equity to Hoffman, thereby rendering that promise false as well.[4]

There is nothing unreasonable about Hoffman's reliance on repeated representations from the co-founders, co-CEOs and Board Members, Cashman and Silberstein. Defendants greatly understate their positions, calling them mere "corporate officers." They were officers, but they were also directors and co-founders and, when Hoffman was at Thras.io, in full control of the

---

[4] Defendants' focus on whether Hoffman has alleged that there was a 409A valuation is misplaced. The fraud alleged is Defendants' misrepresentation of the reasons for the paperwork delay – that they claimed it was owing to 409A when it was really owing to their lack of intent to issue the equity. Although the existence of a 409A valuation further strengthens Hoffman's claim, the claim is not dependent on such a finding. Moreover, Hoffman has adequately alleged that a 409A valuation did exist at the time of the misrepresentations. See Compl., ¶¶ 52, 101.

Company they had so recently founded. See Compl., ¶¶ 7, 8, 11, 13, 15, 18, 19. Their pervasive control of the Company also supports the inference of scienter.

The Consulting Agreement does not affect the viability of Hoffman's fraud claims. First of all, as set forth in Section II.B, the Court should declare the Agreement void. Second, with respect to misrepresentations made prior to execution of the Agreement in order to induce Hoffman to enter into that Agreement and its amendments, Defendants cannot, as a matter of law, hide behind an integration clause as a defense to a fraudulent inducement claim. See Shawmut-Canton LLC v. Great Spring Waters of Am., Inc., 62 Mass. App. Ct. 330, 335 (2004) ("in cases of fraudulent inducement, relief is not barred by an integration clause, even where the parties are sophisticated and their bargaining powers are equal").

Third, Defendants' contention that Hoffman cannot rely on contradictory oral representations misses the mark because the Agreement does not discuss equity and, therefore, does not conflict with the alleged oral representations. Indeed, in Starr v. Fordham, cited by Defendants, the SJC affirmed the trial court's finding of reasonable reliance where provisions of an integrated agreement were not clearly at variance with the oral representation. 420 Mass. 178, 187-88 (1995) (sophisticated attorney reasonably relied on defendant's misrepresentation despite integration clause in partnership agreement). Masingill v. EMC Corp., 449 Mass. 532 (2007) involved a plaintiff who signed a contract knowing that she had not received all of the terms she wanted, in contrast to Hoffman, who signed the Consulting Agreement while separately believing she would also be receiving equity.

In any event, whether Hoffman's reliance was reasonable is an issue of fact. See Ramey v. Beta Bionics, Inc., 2020 Mass. Super. LEXIS 108, at *24 (Mass. Super. Ct. June 15, 2020) (in case involving oral promise of equity in new venture, court stated that "a plaintiff's reliance on an allegedly false representation is . . . a question of fact, as to which dismissal is generally

inappropriate"); see also Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 17 (1st Cir. 2004) (under Massachusetts law, the reasonableness of a party's reliance ordinarily constitutes a question of fact for the jury). It is not unreasonable as a matter of law for a plaintiff to rely on oral representations that are not in conflict with a separate written agreement on a different subject matter. See Crisp Human Capital Ltd. v. Authoria Inc., 613 F. Supp. 2d 136, 140-41 (D. Mass. 2009) (integration clause did not shield defendant from liability for fraud where agreement did not directly contradict alleged misrepresentations).

### D. Hoffman "Purchased" Securities through her Labor, and Defendants Who Promise Securities with a Secret Intention Not to Deliver Are Liable for Securities Fraud Under Section 10(b) of the '34 Act.

The Supreme Court has held that an oral promise to issue a stock option in exchange for services, with a secret intention not to honor the agreement, is securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934. The Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 590-91, 596 (2001) ("[t]o sell an option while secretly intending not to permit the option's exercise is misleading"). The case law cited by Defendants is not to the contrary. Those cases rely on Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). Wharf (Holdings), however, which was decided after Blue Chip, expressly rejected the argument that Blue Chip barred such a claim. The Supreme Court explained that:

> Blue Chip Stamps . . . involved the very different question whether the Act protects a person who did not actually buy securities, but who might have done so had the seller told the truth. The Court held that the Act does not cover such a potential buyer . . . But United is not a potential buyer; **by providing Wharf with its services, it actually bought the option that Wharf sold**. And Blue Chip Stamps said nothing to suggest that oral purchases or sales fall outside the scope of the Act. Rather, the Court's concern was about the abuse potential and proof problems inherent in suits by investors who neither bought nor sold, but asserted they would have traded absent fraudulent conduct by others.

Wharf (Holdings), 532 U.S. at 594 (emphasis added).[5]

Hoffman's securities fraud claim is precisely the sort of claim permitted by Wharf (Holdings). Hoffman alleges that Defendants agreed to issue equity in Thras.io to her while secretly intending, when they made those promises, not to issue that equity. Compl., ¶¶ 26, 53, 93, 100-02, 104, 118. She "purchased" the equity with her labor, and Defendants cheated her. Hoffman is a purchaser of securities within the meaning of Section 10(b).

### E. The Unlawful Consulting Agreement Cannot Shield Defendants From Honoring their Oral Contract with Hoffman to Grant her Equity.

The unlawful Consulting Agreement affords Defendants no shield from honoring their contract with Hoffman to grant her equity. In the first place, it is void as against public policy. Supra, Section II.B.

Second, even if the Consulting Agreement is not void, it does not address any equity grant, and, therefore, neither the integration clause nor the clause purporting to bar oral modifications entitles Defendants to dismissal of Count IV. An integration clause does not bar enforcement of a separate collateral agreement on a different subject matter. See, e.g., Kelly v.

---

[5] Nor do any of the other cases cited by Defendants preclude Hoffman's claim. In re Bank of Boston involved a plaintiff who chose not to sell a security, as opposed to a plaintiff who agreed to buy. MBIA Insurance involved a plaintiff acting as an insurer, not a direct party to the transaction at issue. Neither Fraser nor In re Cendant are from this Circuit and, in any event, the New Jersey District Court in In re Cendant (upon which Fraser relies) distinguished that case from a situation where a plaintiff was induced to enter into a defendant's employ in exchange for equity. See In re Cendant Corp Sec. Litig., 81 F. Supp. 2d 550, 556 (D.N.J. 2000). Desert Land and IDT Corp. are also inapposite. Desert Land involved a borrower on a loan attempting to sue for securities fraud suffered by third party investors. IDT Corp. involved fraud related to a failure to register securities after plaintiff purchased them. Those cases stand for the proposition that a contract with only a tangential relation to securities does not implicate the securities laws. Here, the promises of equity were issued directly in connection with the sale of securities.

Nocion Therapeutics, Inc., 2020 Mass. Super. LEXIS 110, at *4-8 (Mass. Super. Ct. Mar. 3, 2020) (refusing to dismiss claim, under Delaware law, based on integration clause, where plaintiff alleged consulting agreement was not intended to supersede oral joint venture agreement); Gupta v. Cisco Sys., 274 F.3d 1, 2-3 (1st Cir. 2001) (arbitrator concluded integration clause in employment agreement did not replace or supersede agreement regarding repurchase of shares). The integration clause in the Consulting Agreement only covers prior representations "with respect to the subject matter hereof." Ex. A to Defendants' Memo., at § 10(a). Equity grants are not the subject of that Agreement. In addition, the October 2019 oral agreement was a wholly separate, independent contract and not an amendment of the Consulting Agreement. The Complaint clearly states the terms of that contract. Compl., ¶¶ 58-61.[6]

Even if the separate oral agreement regarding equity can be considered a modification, Massachusetts law is clear that clauses such as Section 10(g) of the Consulting Agreement do not necessarily bar a subsequent oral modification. Geis v. Nestlé Waters North America, Inc., 321 F. Supp. 3d 230, 243 (D. Mass. 2018); Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 439 (1992). Whether the parties' conduct constituted an oral modification despite the existence of a no-oral-modification clause is a question of fact for the factfinder. See Geis, 321 F. Supp. 3d at 243 (denying motion to dismiss breach of contract claim and explaining that, "[w]hether an oral modification occurred can be inferred from the conduct of the parties and from the attendant circumstances of the case"). Here, Hoffman alleges that she and Silberstein, on Thras.io's

---

[6] Contrary to Defendants' characterization of the Complaint, Hoffman does not allege that the equity grant was a part of the Agreement; rather, Hoffman alleges that the promises of equity induced her to work for Thras.io. Compl., ¶¶ 19, 25, 27, 54, 76.

behalf, entered into an oral agreement after entering into the Consulting Agreement, and that Thras.io repeatedly affirmed the terms of that oral agreement in subsequent communications. Compl., ¶¶ 58-61, 67-73.[7]

Third, e-mail communications reflecting a subsequent oral agreement may be deemed a sufficient writing to satisfy a no-oral-modification clause. See, e.g., Tomer v. Hollister Assocs., 2006 Mass. Super. LEXIS 56, at *13-14 (Mass. Super. Ct. Jan. 17, 2006) (considering string of e-mails to be a "writing signed by both parties" for purposes of an integration clause). Hoffman has identified at least five e-mail exchanges between herself and Thras.io or its counsel in which the terms of the oral agreement were confirmed or referenced. Compl., ¶¶ 68-73. The existence of such written correspondence precludes dismissal of Hoffman's contract claim.[8]

Finally, Defendants also invoke a Delaware statute, Del. Code Ann. Tit. 8, § 157(a), in an effort to obtain dismissal of Count IV.[9] That statute does not mandate board approval in any

---

[7] Defendants argue that it is not believable that the parties would have entered into an oral contract regarding equity, or that Defendants would have agreed to grant Hoffman equity with the potential for such substantial growth. See Defendants' Memo., p.1 & n.5. This assertion is hard to fathom given the e-mails in which Silberstein confirms the agreement. In any event, Defendants' contention is not the standard of assessing a claim. See Jff Cecilia Llc v. Weiner Ventures, 2020 Mass. Super. LEXIS 105, at *14-15 (Mass. Super. Ct. July 30, 2020) (defendants' insistence that facts alleged in complaint were unbelievable was not a permissible ground for seeking dismissal). The question is not how common this type of contract is but whether it is legally enforceable. Contrary to being "absurd," the exponential growth in the value of the promised equity is exactly what the parties hoped would happen and is exactly the reason why Hoffman agreed to work for Thras.io in the first place. Compl., ¶¶ 19, 25, 76.

[8] Hoffman also expressly alleges the existence of substantial further writings in the documents in Defendants' possession to which she no longer has access. Compl., ¶ 39.

[9] The First Circuit decision cited by Defendants, First Marblehead Corp. v. House, 473 F.3d 1 (1st Cir. 2006), affirmed a summary judgment (not dismissal) in the distinguishable scenario where the oral agreement was in direct conflict with an earlier written stock agreement. The Marblehead decision vacated summary judgment on negligent misrepresentation,

particular format. See Feldman v. Cutaia, 956 A.2d 644, 662 n.67 (Del. Ch. Ct. 2007) (section 157 does not require board decision to be in writing or in the minutes). Here, Hoffman alleges that the equity grant was promised to her on multiple occasions by both Silberstein and Cashman, members of Thras.io's Board, and that Silberstein entered into the oral contract on Thras.io's behalf. Compl., at ¶¶ 20, 24-25, 27, 49, 55-61.[10] She also alleges that she and Thras.io had subsequent written correspondence which referred to the equity grant and that more such documents are in the Defendants' control. Id. ¶¶ 39, 67-73. Hoffman has alleged sufficient facts to satisfy the statute.

Hoffman also alleges facts sufficient to support a finding of ratification or acquiescence. Failure to follow the statutory formalities renders an agreement to issue equity voidable, not void, and as such, the agreement can be enforced if the company ratifies or acquiesces to it. Christian v. Transperfect Global, Inc., 2018 U.S. Dist. LEXIS 162833, at *12-14, 17-18 (S.D.N.Y. Sept. 24, 2018) (denying motion to dismiss under similar circumstances and holding contract could be enforceable). In 2014, Delaware adopted provisions in its General Corporation Law to address situations such as this one where, in the past, courts were unable to remedy inequities caused by failure to follow formalities in the issuance of stock. In re Numida Corp.,

---

emphasizing that "Massachusetts courts have expressed a strong preference that reliance, in the context of negligent misrepresentation claims, be determined by a jury, and not on summary judgment." Id. at 11.

[10] Cashman's and Silberstein's approval constituted Board approval while Hoffman worked at Thras.io. Thras.io's public filings with the SEC and with the Commonwealth of Massachusetts disclose Defendants Cashman and Silberstein as the only directors on Thras.io's Board when Hoffman worked there in 2019. See **Exhibit A** hereto. The Court may take judicial notice of information in these public filings. Fed. R. Evid. 201(d); Ramos v. White (In re Ramos), 2020 Bankr. LEXIS 2341, at *3 n.6 (D. Mass. Bankr. Sept. 2, 2020).

2015 Del. LEXIS 562, at *1 (Del. Oct. 22, 2015). "[N]o defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in this section or validated by the Court of Chancery in a proceeding brought under § 205 of this title." 8 Del. C. § 204(a) ("Section 204"). As the Delaware Supreme Court explained:

> Sections 204 and 205 were adopted in part to address situations that had arisen in prior cases . . . where parties who are complicit in failing to comply with the DGCL's requirements refuse to participate in the validation of their own past intended actions because they have come to have personal reasons to wish to disclaim their prior promises and actions.

In re Numida Corp., 2015 Del. LEXIS 562, at *8-9. This reasoning is entirely applicable here.

Section 204 provides for ratification of defective corporate acts, including the issuance of stock, and states that the procedures outlined in the statute "shall not be deemed to be the exclusive means of ratifying or validating any act or transaction taken by or on behalf of the corporation, including any defective corporate act, or any issuance of stock, including any putative stock." 8 Del. C. § 204(i) (emphasis added); cf. also Knoll Capital Mgmt. L.P. v. Advaxis, Inc., 2016 Del. Ch. LEXIS 17, at *5-7 (Del. Ch. Ct. Jan. 11, 2016) (denying motion to dismiss; under Section 204, the court has discretion to validate defective corporate acts). The Complaint expressly alleges that the Defendants accepted the benefit of Hoffman's work pursuant to the promises by Cashman and Silberstein – the Company's founders, co-CEOs and Board Members (apparently then the sole Board Members). The Company thereby acquiesced to and ratified the agreement.

To the extent Defendants failed to issue the equity grant as agreed, such failure was a result of their own wrongdoing and should not result in dismissal of Hoffman's claim. There is no legitimate question that the alleged equity agreement existed, when Thras.io and its general counsel acknowledged it in writing. All that remained was the ministerial act of issuing the

equity. Defendants gave Hoffman every reason to believe she had equity and repeatedly proffered false explanations to Hoffman as to why the paperwork memorializing her grant had not yet been issued. They cannot use their own wrongdoing as a basis to block her claim. See, e.g., Kalageorgi v. Victor Kamkin, Inc., 750 A.2d 531, 539 n.10 (Del. Ch. Ct. 1999) (if directors bound company to sell stock, then it could be equitably compelled to perform the ministerial act of issuing the shares).

### F. Hoffman Reasonably Relied on Cashman's and Silberstein's Promises, and the Consulting Agreement is No Bar to Her Claim for Promissory Estoppel.

Neither can Defendants secure dismissal of Hoffman's promissory estoppel claim based on a void, unlawful Consulting Agreement that does not address the concept of equity. First, the Agreement is unlawful, contrary to public policy and void. Supra, Section II.B. Second, Cashman's and Silberstein's promises do not directly contradict any provision of that Agreement.[11] See Defendants' Memo., Exs. A-D. The Agreement does not address the concept of equity, nor do Defendants identify any basis in that Agreement to believe that it was intended to encompass all aspects of Hoffman's relationship with Thras.io, as opposed to addressing the cash compensation she would receive. Without identifying an actual contradiction between the alleged oral representations and the Consulting Agreement, there is no basis for dismissing Hoffman's promissory estoppel claim. See Citibank, N.A. v. Najda, 2016 U.S. Dist. LEXIS 4167, at *15-16 (D. Mass. Jan. 13, 2016) (denying motion to dismiss promissory estoppel claim where written agreement did not contradict promise); Fin Brand Positioning, LLC v. Take 2

[11] Defendants' case law in this regard (Trifiro, Arabian, and McMahon) does not further their argument because all of those cases involved statements that conflicted with a written agreement.

Dough Prods., 2011 U.S. Dist. LEXIS 140273, at *24-26 (D.N.H. Dec. 6, 2011) (in case with analogous facts involving a consulting agreement and oral promises of equity, court denied summary judgment on promissory estoppel claim were the consulting agreement and equity promise dealt with "entirely different subject matter").

Nor is there any basis for finding that Hoffman's reliance on the oral promises was unreasonable as a matter of law. There was no reason for Hoffman to question Cashman's or Silberstein's authority to make those promises on behalf of Thras.io. Nor, at the time, did she have any reason to doubt their good faith. Compl., ¶¶ 13, 17, 19-20, 23-25, 27, 36, 45, 49-50, 52, 54. Reasonableness is typically a question of fact. Supra, Section II.C; Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 204 (1st Cir. 2004) (unpersuaded by argument that plaintiffs could not reasonably rely on a promise because documents did not contain that promise). Moreover, Defendants provide no support for their apparent contention that it is unreasonable for someone to rely on oral representations simply because that person is also party to a written agreement on another subject matter.

Finally, Defendants' argument that the promise is not specific enough is meritless. Hoffman alleges that Defendants expressly promised to issue her equity in Thras.io that was between $1 and $2 million, that would be based on a valuation of the Company from Q1 2019, that would begin vesting on May 1, 2019, and for which the paperwork would be completed as soon as the Company had a 409A valuation. Compl., ¶¶ 20, 24. The Complaint satisfies Hoffman's obligation to make a short and plain statement of her claim.

### G. Making False Promises to Secure Services and Denying Known Obligations in Bad Faith is Unfair and Deceptive Conduct in Violation of Chapter 93A.[12]

Whether particular conduct is unfair or deceptive is an issue of fact that is ill-suited for resolution on a motion to dismiss. See, e.g., Brand Group Int'l, LLC v. Established Brands Int'l, 2011 U.S. Dist. LEXIS 81507, at *13-14 (D. Mass. July 26, 2011) (allegations of false promises to induce plaintiff to perform work for defendant were "fact-specific and require[d] further discovery and development to determine whether they constitute unfair acts or practices"). Hoffman's allegations here fall squarely within the bounds of unfair and deceptive conduct. Conduct violates Chapter 93A when defendants act in disregard of a known contractual obligation and in order to secure benefits for themselves. See, e.g., Anthony's Pier Four Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991); Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55-56 (1st Cir. 1998) (defendant strung plaintiff along with promises of payment). False representations to induce another party to provide services also violate Chapter 93A. See Marshall v. Stratus Pharms., Inc., 51 Mass. App. Ct. 667, 676 (2001) (defendants never intended to pay for the services); Arthur D. Little, 147 F.3d at 52 (defendant ordered services without intending to pay); McCarter & English, LLP v. PcVue, Inc., 2020 Mass. Super. LEXIS 17, at *3 (Mass. Super. Ct. Jan. 24, 2020) (defendants tricked plaintiff into continuing to provide services for which defendants never intended to pay). Hoffman's extensive allegations of wrongdoing cannot properly be dismissed on a Rule 12(b)(6) record. Compl., ¶¶ 20, 24, 26-27, 29, 48-50.

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss.

---

12 Hoffman alleges a Chapter 93A violation as an alternative claim in the event that she does not prevail on her misclassification claim. See Fed. R. Civ. P. 8(d).

Respectfully submitted,

SASHA HOFFMAN,

By her attorneys,

/s/ Sean T. Carnathan

Sean T. Carnathan (BBO # 636889)
scarnathan@ocmlaw.net
Stephanie R. Parker (BBO# 687610)
sparker@ocmlaw.net
O'Connor Carnathan and Mack LLC
1 Van de Graaff Drive, Suite 104
Burlington, Massachusetts 01803
Tel. 781-359-9000

Dated: January 22, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 22, 2021.

_____/s/ Sean T. Carnathan_____________
Sean T. Carnathan