## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                 )
SASHA HOFFMAN,                   )
                                 )
                Plaintiff,       )
                                 )    Civil Action
v.                               )    No. 20-12224-PBS
                                 )
THRAS.IO INC., JOSHUA SILBERSTEIN, )
and CARLOS CASHMAN,              )
                                 )
                Defendants.      )
_____)
```

### MEMORANDUM AND ORDER

May 10, 2021

Saris, D.J.

### INTRODUCTION

Plaintiff Sasha Hoffman worked for defendant Thras.io Inc., a start-up, for six months under a series of contracts that identified her as an independent contractor. Hoffman claims that Thras.io and its leaders, defendants Joshua Silberstein and Carlos Cashman, induced her to work for them by repeatedly promising her an equity grant in the company. Thras.io's valuation has since soared, allegedly raising the value of Hoffman's promised equity grant to approximately $7.5 million. Hoffman never received an equity grant, and Defendants deny that she is owed one. Hoffman filed claims against all defendants for misclassification as an independent contractor in violation of Mass. Gen. Laws ch. 149, §§ 148B and 150 (Count I), common law fraud (Count II), violation

of the Securities Exchange Act, 15 U.S.C. § 78(j)(b) (Count III), and violation of Mass. Gen. Laws ch. 93A, § 11 (Count VI), as well as claims against Thras.io for breach of contract (Count IV) and promissory estoppel (Count V). Defendants now move to dismiss all claims.

After hearing, the Court **ALLOWS** in part and **DENIES** in part Defendants' motion to dismiss (Dkt. 12).

**FACTUAL BACKGROUND**

The following facts are derived from the complaint and must be accepted as true at the motion to dismiss stage. See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71-72 (1st Cir. 2014).

**I.   Parties**

Plaintiff Sasha Hoffman ("Hoffman") is a former investment banker with experience in executive management of early-stage start-ups. She is a citizen of California.

Defendant Thras.io Inc. ("Thras.io") acquires and optimizes Amazon third-party businesses. It is a Delaware corporation with its principal place of business in Walpole, Massachusetts. Defendants Joshua Silberstein ("Silberstein") and Carlos Cashman ("Cashman") are co-Chief Executive Officers, co-founders, and members of the Board of Directors at Thras.io. At all relevant times, Silberstein and Cashman were the only members of the Board of Directors. Silberstein is a citizen of New York, and Cashman is

a citizen of Massachusetts. Both Silberstein and Cashman are named in their individual capacities.

## II.  <u>Pre-Contract Equity Promises</u>

In early 2019, Defendants recruited Hoffman to work for Thras.io in a senior management role. Because Thras.io was in an early start-up phase at the time Defendants recruited her, they balanced Thras.io's inability to pay a competitive wage with the promise of equity in the company. The promised equity was "a critical component of persuading [her] to invest her time and talents in Thras.io." Dkt. 1-1 ¶ 1. She claims that the "primary reason [she] was willing to consider working for Thras.io was Silberstein and Cashman's repeated assurance that she would receive a substantial equity stake in the Company if she would work with them." <u>Id.</u> ¶ 19.

Between January and May 2019, before Hoffman signed any documents or formally agreed to work for Thras.io, Defendants repeatedly and explicitly promised her an equity grant of between $1 million and $2 million based on the Q1 2019 valuation of approximately $22 million, when Thras.io's stock was valued at no more than $1.00 per share. However, once Hoffman began working at Thras.io, Silberstein and Cashman told her that all Thras.io employees "were waiting for their equity grants because the Company did not have a valid '409A valuation,'" which companies use to set equity grant prices "in a manner that satisfies the IRS and avoids

tax liability for the employee at the time of the grant." Id. ¶ 2;
see also id. ¶ 21. Defendants repeatedly assured Hoffman, in
conversations both before and after she started working at
Thras.io, that "(1) as soon as they had a 409A valuation, they
would issue her equity grant; (2) her grant would be 'trued up' to
be based on the valuation from Q1 2019; and (3) her vesting would
begin on May 1, 2019 and she would be vested based upon a 4-year
vesting schedule from that date regardless of whether she agreed
to take a long-term position at Thras.io or not." Id. ¶ 24.

### III. **The Consulting Agreements**

Hoffman began working for Thras.io in May 2019. She signed a
"Consulting Agreement" for a trial period from May 1, 2019 to July
31, 2019. Silberstein signed the Consulting Agreement on behalf of
Thras.io. Hoffman later signed three additional "Consulting
Agreements" extending her work term in August, September, and
October 2019. Silberstein signed the August and September
Consulting Agreements, and Danny Boockvar, Thras.io's President,
signed the October Consulting Agreement. Each of the Consulting
Agreements designated her as an independent contractor. At the
same times, Hoffman also signed a non-disclosure agreement that
designated her as an employee. Each Consulting Agreement contained
the following integration clause:

> Entire Consulting Agreement. This Consulting Agreement
> (including any exhibits, schedules and other documents
> referred to herein) contains the entire understanding

> between the parties hereto with respect to the subject
> matter hereof and supersedes any prior understandings,
> agreements or representations, written or oral, relating
> to the subject matter hereof.

Dkts. 13-1 at 6, 13-2 at 6, 13-3 at 6, 13-4 at 6. Further, each

Consulting Agreement contained the following modification clause:

> Modification, Amendment, Waiver or Termination. No
> provision of this Consulting Agreement may be modified,
> amended, waived or terminated except by a prior
> instrument in writing signed by the parties to this
> Consulting Agreement. No course of dealing between the
> parties will modify, amend, waive or terminate any
> provision of this Consulting Agreement or any rights or
> obligations of any party under or by reason of this
> Consulting Agreement.

Id.

Defendants required Hoffman to devote her full-time efforts

to Thras.io. She was unable to pursue any outside opportunities

while working for the company, and she operated as a member of

Thras.io's senior management team. At no time during her employment

by Thras.io from May to October 2019 did Hoffman perform work for

any other entity. Hoffman used a company email address and a

company computer, had keys to the company offices in Boston and

New York, participated in senior management meetings, and often

worked more than forty hours per week.

Each time Hoffman extended her work term and signed a new

Consulting Agreement, Defendants promised her that she would

receive her equity grant as soon as a valid 409A valuation for the

company came through, and her decision to continue working for

Thras.io was based primarily on these promises. By August 2019, Hoffman became aware that other employees had received their equity grants. When she confronted Defendants about this, they told Hoffman that it would be "'easier' to roll the grant into her long-term contract or provide it at her departure from the Company." Dkt. 1-1 ¶ 52. Defendants "specifically and explicitly committed to Ms. Hoffman that she would receive this equity regardless of whether she took on a long-term role with the Company." Id.

### IV.   **Post-Departure Equity Promises**

In October 2019, the parties agreed that Hoffman would not take on a permanent role at Thras.io and that her employment would end on October 31, 2019. Hoffman met with Silberstein on October 30, 2019, when they agreed that Thras.io would grant her $1.2 million in equity over a four-year vesting schedule based on the Q1 2019 valuation of the company. Because Hoffman worked for Thras.io for six months, her grant entitled her to $150,000 in Thras.io equity pegged to the Q1 2019 valuation. Silberstein repeated at the October 30 meeting that Hoffman would be provided with her equity as soon as the company had a valid 409A valuation and that Thras.io would "true up" the grant to ensure she received the full value of the equity promised to her. Id. ¶ 60.

Silberstein and Cashman repeatedly acknowledged the promised equity in writing in emails to Hoffman. For example, a January 7, 2020 email from Silberstein states, "Once the valuation is

completed, we'll know what the strike price is for the updated shares, and can explore how much impact that has on the overall grant." Id. ¶ 68. A March 15, 2020 email from Silberstein similarly states, "[We] now need to wait until we conclude the new financing before we can issue new options/shares. . . . [T]he bottom line is that if I were to issue you options right now you'd potentially have a significant tax liability if the strike price turned out to be lower than where the 409(a) eventually places the valuation." Id. ¶ 69. An April 10, 2020 email from Silberstein states, "The grant will be pegged to the fmv at the time we discussed it, not the 409(a). . . . We can discuss true-up mechanics… there is more than one way to accomplish that." Id. ¶ 70. And an April 14, 2020 email from Silberstein states, "The quantum of shares won't change. The exercise price will, but it should amount to a rounding error in the long run. We can discuss what protections are appropriate to keep your economics unaffected." Id. ¶ 71. On June 5, 2020, Silberstein expressly confirmed the terms of the equity grant to Hoffman in a telephone call.

V.  **The Dispute**

On July 27, 2020, Thras.io's general counsel sent an email to Hoffman stating, "Since the time of your original conversations with Josh [Silberstein], we have decided against affecting 'true-ups' such as you are suggesting." Id. ¶ 73. By that time, the company's valuation had skyrocketed to upwards of $1 billion. Given

the significant increase in Thras.io's valuation since Q1 2019, Hoffman's equity grant, if "trued-up," is now worth approximately $7.5 million.

Hoffman alleges that, in addition to its failure to provide the promised equity grant, Thras.io did not provide her with unspecified "customary benefits of employment received by other Thras.io employees" because of her designation as an independent contractor. Id. ¶ 77.

On November 20, 2020, Hoffman filed her complaint in Norfolk County Superior Court. On December 15, 2020, Defendants removed to this Court. Defendants now move to dismiss all counts for failure to state a claim.

## MOTION TO DISMISS

### I.   Legal Standard

A Rule 12(b)(6) motion is used to dismiss complaints that do not "state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must "possess enough heft" to state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). In evaluating the motion, the Court must accept the factual allegations in the plaintiff's complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible

claim upon which relief may be granted." Foley, 772 F.3d at 71 (cleaned up). On a motion to dismiss, courts generally may consider "only the complaint, documents attached to it, and documents expressly incorporated into it." Id. at 72.

## II.  **Analysis**

### a. **Misclassification (Count I)**

Under Massachusetts law, an employer who both "fails to properly classify an individual as an employee" under the statutory test and "fails to comply, in any respect," with one of several listed provisions is subject to liability.[1] Mass. Gen. Laws ch. 149, § 148B(d).

---

[1] The Massachusetts Attorney General has described those statutes as:

- The wage and hour laws set forth in M.G.L. c. 149.
- The minimum wage law set out in M.G.L. c. 151, s. 1A, 1B, and 19; 455 CMR 2.01, et seq.
- The overtime law set forth in M.G.L. c. 151, s. 1, 1A, 1B, and 19.
- The law requiring employers to keep true and accurate employee payroll records, and to furnish the records to the Attorney General upon request as required by M.G.L. c. 151, s. 15.
- Provisions requiring employers to take and pay over withholding taxes on employee wages. M.G.L. c. 62B.
- The worker's compensation provisions punishing knowing misclassification of an employee. M.G.L. c. 152, s. 14.

Office of the Attorney General, "An Advisory from the Attorney General's Fair Labor Division on M.G.L. c. 149, s. 148B," Advisory 2008/1, at 4 (footnote omitted), https://www.mass.gov/doc/attorney-generals-advisory-on-the-independent-contractor-law; see Mass. Gen. Laws ch. 149, § 148B(d).

Defendants argue that Hoffman has not stated a plausible claim under § 148B(d) because (1) equity grants do not constitute "wages" under the Mass. Gen. Laws ch. 149 and (2) she has not alleged sufficient facts to support a claim of withheld employee benefits.

The Wage Act requires timely payment of wages earned by an employee. Mass. Gen. Laws ch. 149, § 148. It defines "wages" to include "holiday or vacation payments due to an employee under an oral or written agreement" and certain "definitely determined" commissions. Id. The term "wages" is not otherwise defined. When analyzing the term "wages" under the statute, "courts have been reluctant to extend its reach beyond the wages, salary, holiday pay, vacation pay, and definitely determined commissions which the statute expressly mentions." Roma v. Raito, Inc., No. 1:13-CV-10297-LTS, 2015 WL 1523098, at *7 (D. Mass. Mar. 31, 2015). Courts have refused to adopt "a broad definition of wages" because the Act's purpose is to prevent the unreasonable detention of wages. Weiss v. DHL Express, Inc., 718 F.3d 39, 47 (1st Cir. 2013) (citing Bos. Police Patrolmen's Ass'n, Inc. v. City of Boston, 761 N.E.2d 479, 481 (Mass. 2002). In keeping with this narrow purpose, the Supreme Judicial Court has held that a discretionary stock bonus contingent on continued employment until the vesting period was not covered by the Wage Act. See Weems v. Citigroup, Inc., 900 N.E.2d 89, 94 & n.10 (Mass. 2009). One court has held that an equity grant is not a "wage." See Sterling Rsch. Inc. v.

<u>Pietrobono</u>, Civ. Action No. 02-40150-FDS, 2005 WL 3116758, at *14 (D. Mass. Nov. 21, 2005) (holding that equity "intended as a salary substitute that was earned over time and was part of his incentive compensation bonus" was not a wage (cleaned up)). Here, the material terms of the alleged grant of equity were not negotiated until the end of the alleged employment. Based on these allegations, this Court holds that Hoffman has not made a plausible claim that the equity grant was a "wage" under the Wage Act.

In conclusory fashion, Hoffman also alleges that she did not receive any of the customary benefits of employment received by other Thras.io employees. Hoffman's specific allegation that Defendants deprived her of employee benefits including health insurance and the employer share of her payroll taxes and that they violated the overtime requirements of Mass. Gen. Laws. ch. 151, § 1A was raised for the first time in her opposition.

The Court **<u>ALLOWS</u>** the motion to dismiss as to Count I with respect to the equity grant. However, Hoffman may move to amend her complaint to provide more specific factual allegations regarding the alleged denial of benefits and violation of overtime requirements.

### b. Common Law Fraud (Count II)

Massachusetts common law fraud requires (1) "a false representation of a material fact," (2) "made with knowledge of its falsity," (3) "for the purpose of inducing a party to act

thereon," and (4) "that the party relied upon the representation as true and acted upon it to its detriment." CardiAQ Valve Techs., Inc. v. Neovasc, Inc., 57 F. Supp. 3d 118, 123 (D. Mass. 2014) (citing Slaney v. Westwood Auto, Inc., 322 N.E.2d 768, 779 (Mass. 1975)). The party alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In other words, "the pleader usually is expected to specify the who, what, where, and when of the allegedly false or fraudulent representation." Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).

Defendants argue that Hoffman has failed to allege an actionable misstatement with sufficient particularity. Further, they claim that the Consulting Agreement's integration clause forecloses Hoffman's fraud claim because she negotiated and voluntarily signed the contract, which specifically addressed her compensation. Dkt. 13 at 18 (citing Starr v. Fordham, 648 N.E.2d 1261, 1268 (Mass. 1995)). The Supreme Judicial Court has held that "[a]n integration clause in a contract does not insulate automatically a party from liability where he induced another person to enter into a contract by misrepresentation." Starr, 648 N.E.2d at 1268; see also Shawmut-Canton LLC v. Great Spring Waters of Am., Inc., 816 N.E.2d 545, 549 (Mass. App. Ct. 2004) ("[I]n cases of fraudulent inducement, relief is not barred by an integration clause, even where the parties are sophisticated and

their bargaining powers are equal."). However, where a contract is fully negotiated and signed, a plaintiff may not raise as fraudulent "any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue." Starr, 648 N.E.2d at 1268 (citation omitted).

Hoffman has pleaded the elements of common law fraud with sufficient particularity. The complaint details specific statements made by Silberstein promising her equity, indicates the time and place of those statements, and explains why the statements were fraudulent at the time. For example, in August 2019, Hoffman alleges other Thras.io employees received their equity grants while contemporaneously Silberstein was falsely telling Hoffman that he could not issue her equity grant because the company lacked a valid 409A valuation. There is no provision in the consulting agreement that specifically addresses the grant of equity.

The next disputed issue is whether Hoffman has alleged sufficient facts to support reasonable reliance on the representations. Specifically, Defendants point to the language in the agreement as contradicting the alleged oral promises of equity "in return for [Hoffman's] work." See Dkt. 1-1 ¶ 1. However, Hoffman plausibly alleges she reasonably relied on oral and written promises of an equity grant memorialized by a series of emails which arguably created a new contract or modification of the old. With all reasonable inferences drawn in Hoffman's favor, the

complaint "sets forth a plausible claim upon which relief may be granted" on a claim of fraudulent inducement of consulting contracts. Foley, 772 F.3d at 71 (cleaned up). The Court **DENIES** the motion to dismiss as to Count II.

### c. Violation of the Securities Exchange Act, 15 U.S.C. § 78j(b) (Count III)

Section 10(b) of the Securities Exchange Act of 1934 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.

15 U.S.C. § 78j(b). A plaintiff bringing a securities fraud claim under Section 10(b) and Rule 10b-5 must comply with the pleading requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4. The First Circuit has held that the PSLRA "d[oes] not alter this circuit's rigorous reading of the standards for pleading fraud." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002) (stating that a plaintiff must specify time, place, and content of allegedly misleading statements and factual support for their fraudulence). "If the plaintiff brings his claims on information and belief, he must set forth the source of the information and the reasons for the belief." Id. (cleaned up). "Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular

allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter." Id. Scienter for a federal securities claim may be proved by indirect evidence and may include extreme recklessness. In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002).

Defendants argue that under Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730-31 (1975), Hoffman is not a "purchaser" of securities and thus has no right of action under Section 10(b). Hoffman responds that she "purchased" equity in Thras.io with her labor, giving her a right of action under Section 10(b) as the Supreme Court recognized in The Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 590-91, 596 (2001).

The Wharf governs here. As the Supreme Court explained, "Blue Chip Stamps . . . involved the very different question whether the Act protects a person who did not actually buy securities, but who might have done so had the seller told the truth." Id. at 594. By contrast, the Supreme Court held the plaintiff in The Wharf that alleged it specifically bargained for an option in exchange for providing services was "not a potential buyer; by providing Wharf with its services, it actually bought the option that Wharf sold." Id.; see also Wortley v. Camplin, 333 F.3d 284, 294 (1st Cir. 2003) ("When the defendant makes a specific promise, as part of the consideration for the transfer of securities, to perform an act,

while intending not to perform the act, this may constitute a basis for a fraud finding.").

Some courts have held that grants of stock to persons who were already employed were not purchasers because they did not independently bargain for the stock. See Fraser v. Fiduciary Tr. Co. Int'l, 417 F. Supp. 2d 310, 318 (S.D.N.Y. 2006) (finding that an employee who received a grant of stock as part of his compensation through a restricted stock award program did not qualify as a "purchaser"); In re Cendant Corp. Sec. Litig., 81 F. Supp. 2d 550, 556 (D.N.J. 2000) ("When an employee does not give anything of value for stock other than the continuation of employment nor independently bargains for stock, there is no purchase or sale of securities." (cleaned up)). Where there is a bargained for exchange of services for securities, "the abuse potential and proof problems inherent in suits by investors who neither bought nor sold, but asserted they would have traded absent fraudulent conduct by others" are of less concern. See The Wharf, 532 U.S. at 595 (holding that oral purchases fall within the scope of the Act) (cleaned up).

Hoffman has alleged Defendants promised her security in exchange for her provision of consulting services while secretly intending not to perform this act. At this early stage of litigation, these allegations support the inference that she was a "purchaser" of securities by providing her work in exchange for

16

a bargained for equity grant. Defendants' motion to dismiss is **DENIED** as to Count III.

### d. Breach of Contract (Count IV)

Defendants argue that the Consulting Agreement's integration and modification clauses prohibit Hoffman from claiming that an enforceable oral agreement, made either before or after she signed the Consulting Agreement and its extensions, existed as to the equity grant. Moreover, they deny that Hoffman has alleged a written modification to the Consulting Agreement. Finally, they argue that the alleged equity grant is unenforceable as a matter of law because Delaware law requires that the issuance of stock be in writing and approved by the board of directors, and Hoffman has not alleged sufficient facts to meet those requirements. See Del. Code Ann. tit. 8, § 157(a)–(b); see also First Marblehead Corp. v. House, 473 F.3d 1, 6 (1st Cir. 2006).

Hoffman responds that the equity grant is unaffected by the integration clause because it constitutes a "wholly separate, independent contract and not an amendment of the Consulting Agreement." Dkt. 19 at 20 (citing Dkt. 1-1 ¶¶ 58-61). She also argues it is void as against public policy because she was misclassified as an independent contractor. Alternatively, Hoffman argues that the modification clause does not necessarily bar oral modification of the Consulting Agreement under Massachusetts law, and that the emails constitute a written modification. Finally,

Hoffman argues that her equity grant was either approved or ratified by Thras.io's board of directors – which consisted only of Silberstein and Cashman.

The complaint has alleged sufficient facts to plausibly overcome the modification clause. "[A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract." Geis v. Nestlé Waters North America, Inc., 321 F. Supp. 3d 230, 243 (D. Mass. 2018) (quoting Cambridgeport Sav. Bank v. Boersner, 597 N.E.2d 1017, 1022 (Mass. 1992)). "Whether an oral modification occurred can be inferred from the conduct of the parties and from the attendant circumstances of the case." Id. (cleaned up). The proponent of the oral modification must present evidence "of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties." Id. (cleaned up). Here, Hoffman has alleged a repeated course of communications with Silberstein confirming the terms of her equity grant. She has also alleged multiple promises by both Silberstein and Cashman through emails. These allegations are sufficient to overcome this presumption.

The harder question is whether Delaware law compels dismissal. Pursuant to Delaware law, "every corporation may create and issue . . . rights or options . . . such rights or options to

be evidenced by or in such instrument or instruments as shall be approved by the board of directors." See Del. Code Ann. tit. 8, § 157(a). Delaware law requires that "commitments regarding the issuance of stock must be approved in writing by the board of directors" to be effective. Grimes v. Alteon, Inc., 804 A.2d 256, 258 (Del. 2002); see Del. Code Ann. tit. 8, § 157(b). "Delaware courts have adhered to statutory requirements respecting stocks when denying claims for equitable relief — even in situations when that might generate an inequitable result." First Marblehead Corp., 473 F.3d at 6 (cleaned up). This law is not ironclad as Delaware courts in certain circumstances recognize narrow exceptions. Id. at 7. One court has "considered extrinsic evidence in determining whether a grant of stock options complied with section 157(b)." Feldman v. Cutaia, 956 A.2d 644, 662 n.67 (Del. Ch. Ct. 2007), aff'd, 951 A.2d 727 (Del. 2008). But see CertiSign Holding, Inc. v. Kulikovsky, C.A. No. 12055-VCS, 2018 WL 2938311, at *17–19 (Del. Ch. Ct. June 7, 2018) (unpublished) (finding "total failure to comply with any aspect of Sections 157(a) and (b)" despite emails between the necessary parties expressing agreement to grant of options).

Hoffman has alleged that the stock grant was evidenced by a string of emails approved by both members of the board of directors, which consisted of only Cashman and Silberstein. While the caselaw interpreting Delaware law suggests that a mere exchange

of emails will not suffice, this issue is better reviewed on a full record to determine whether there is an unambiguous written instrument approved by both board members. See Anderson v. Dobson, 627 F. Supp. 2d 619, 627 (W.D.N.C. 2007) (finding as a matter of law that stock was not validly issued under Delaware law where "the only possible written instrument evidencing the issuance" were meeting minutes "so ambiguous as to the issuance of these particular shares that they cannot qualify") (cleaned up). Defendants' motion to dismiss is **DENIED** as to Count IV.

### e. Promissory Estoppel (Count V)

Defendants argue that Hoffman fails to state a claim for promissory estoppel because her alleged reliance on Silberstein's oral statements was unreasonable as a matter of law. While the Consulting Agreement arguably contradicts the alleged oral promises of equity "in return for [Hoffman's] work," Dkt. 1-1 ¶ 1, the agreements do not address the issue of equity. Reliance on the emails cited in the complaint and others allegedly in Defendants' sole possession and control was not as a matter of law unreasonable. The Court **DENIES** the motion to dismiss as to Count V.

### f. Violation of Mass. Gen. Laws ch. 93A (Count VI)

Defendants argue that Hoffman alleges no more than a simple breach of contract, which cannot support a Chapter 93A claim.[2] Hoffman responds that "[c]onduct violates Chapter 93A when defendants act in disregard of a known contractual obligation and in order to secure benefits for themselves." Dkt. 19 at 26 (citing Anthony's Pier Four Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991); Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55-56 (1st Cir. 1998)).

Chapter 93A declares unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. To prevail on the Chapter 93A claim, Hoffman must prove that Defendants "committed an unfair or deceptive trade practice and that [Hoffman] suffered a loss of money or property as a result." Bowers v. Baystate Techs., Inc., 101 F. Supp. 2d 53, 54-55 (D. Mass. 2000) (citing Alan Corp. v. Int'l Surplus Lines Ins., 823 F. Supp. 33, 43 (D. Mass. 1993)). To this end, Hoffman must demonstrate that Defendants' actions "fell 'within at least the penumbra of some common-law, statutory or other established concept of unfairness,' or were otherwise 'immoral, unethical,

---

[2] If the Court determines that Hoffman is an employee, Chapter 93A is inapplicable. See Manning v. Zuckerman, 444 N.E.2d 1262, 1266 (Mass. 1983).

oppressive or unscrupulous.'" Id. at 55 (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)).

Breach of contract, without more, does not amount to a 93A violation. Monotype Imaging Inc. v. Deluxe Corp., 883 F. Supp. 2d 317, 323 (D. Mass. 2012). "In some cases, however, the facts giving rise to a breach of contract claim will also give rise to a Chapter 93A claim" if "some level of bad faith [is] present." Id. A contract dispute can give rise to a 93A claim, for example, if there is evidence that the breaching party acted with an "ulterior motive." Framingham Auto Sales, Inc. v. Workers' Credit Union, 671 N.E.2d 963, 965 (Mass. App. Ct. 1996).

The question is whether Hoffman's allegations that Defendants promised her an equity grant they never intended to deliver supports the inference that Defendants strung her along in bad faith. Hoffman pleaded that Defendants told her that her equity grant was delayed because Thras.io could not issue equity grants without a valid 409A valuation, while providing other employees with their equity grants at that time. Assuming that she is not an employee, the Court concludes Hoffman's allegations are enough to state a plausible claim that Defendants acted with an "ulterior motive" in violation of Chapter 93A. See id. Accordingly, the Court **DENIES** Defendants' motion to dismiss as to Count VI.

## ORDER

Defendants' motion to dismiss (Dkt. 12) is **ALLOWED** without prejudice to amendment as to Count I and **DENIED** as to Counts II-VI.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge