<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   SASHA HOFFMAN,                      )
                                        )
 4                Plaintiff             )
                                        )
 5        -VS-                          )  CA No. 20-12224-PBS
                                        )  Pages 1 - 40
 6   THRAS.IO, INC., et al,             )
                                        )
 7                Defendants            )


 8

 9                 **MOTION HEARING BY VIDEO**

10         BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
11

12

13

14

15                         United States District Court
                           1 Courthouse Way
16                         Boston, Massachusetts  02210
                           January 19, 2023, 9:33 a.m.
17

18

19

20

21

22                          LEE A. MARZILLI
23                       OFFICIAL COURT REPORTER
                        United States District Court
24                      1 Courthouse Way, Room 7200
                           Boston, MA  02210
25                          leemarz@aol.com
</pre>

1    A P P E A R A N C E S:

2        SEAN T. CARNATHAN, ESQ., O'Connor, Carnathan and Mack LLC,
     67 South Bedford Street, 400W, Burlington, Massachusetts,
3    01803, for the Plaintiff.

4        BRONWYN L. ROBERTS, ESQ., TIMOTHY W. COOK, ESQ., and
     CHARLOTTE DREW, ESQ., Cooley LLP, 500 Boylston Street, Boston,
5    Massachusetts, 02116-3736, for the Defendants.

6    ALSO PRESENT:  Michael Fahey, Esq.
                    Doug Neu, Esq.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2       THE CLERK:  Good morning, Judge.

3       THE COURT:  Yes, thank you.

4       THE CLERK:  I have both sides on, so I'll call the

5  case.  The Court calls Civil Action 20-1224, Hoffman v.

6  Thras.io Inc., et al.  Could counsel please identify themselves.

7       MR. CARNATHAN:  Good morning, your Honor.  Sean

8  Carnathan here for Sasha Hoffman, the plaintiff.

9       THE COURT:  Thank you.

09:33 10       MS. ROBERTS:  Good morning, your Honor.  Bronwyn

11  Roberts from Cooley LLP on behalf of Thras.io Inc., Mr. Joshua

12  Silberstein, and Mr. Carlos Cashman.  Here with me today are

13  also the general counsel of Thras.io, Mr. Michael Fahey, and

14  Senior Counsel Doug Neu.  In addition, my colleague Timothy

15  Cook is present on the screen, and my colleague Charlotte Drew,

16  who's in my office but not present on the screen.

17       THE COURT:  Thank you.  Is everyone going to be

18  arguing?  I prefer only to see people who are going to be

19  arguing.  It otherwise gets confusing to me.

09:34 20       MS. ROBERTS:  I will be arguing on behalf of

21  defendants.

22       THE COURT:  And who's arguing for plaintiffs?

23       MR. CARNATHAN:  That will be me, your Honor.

24       THE COURT:  And so is anyone else on the screen who's

25  not going to be arguing?  It says Doug --

1            MS. ROBERTS:  Oh, Mr. Neu, I think you're on mute.  I
2     think the Court is asking maybe if you would bring down your
3     video.
4            MR. NEU:  Sure.  I'm happy to do that.
5            THE COURT:  Thank you.  Okay, so this is an aging
6     case, an old case.  We now have a full record.
7            MS. ROBERTS:  Yes, your Honor.
8            THE COURT:  So maybe we start with the defendants.
9            MS. ROBERTS:  Thank you, your Honor.  After two years
09:35 10     of litigation and extensive discovery on the part of
11     Ms. Hoffman, there are no legal claims that exist that could be
12     submitted to a jury.  The timeline of events is key to
13     disposing of this case at summary judgment.  There are really
14     two timelines that are important for the Court.  One timeline
15     begins with Ms. Hoffman's introduction to Thras.io, its
16     executives.  It continues throughout her service period to the
17     company.
18            There's a second timeline that commences during her
19     exit interview, when all of her work was completed, and
09:35 20     continues for approximately nine months into 2020.
21            Before getting into the details of those timelines, I
22     thought I would introduce the players.  Thras.io is a Delaware
23     corporation, as the Court knows, founded by Carlos Cashman and
24     Joshua Silberstein.  It requires and operates Amazon
25     third-party private-label businesses.  Ms. Hoffman is a highly

1   compensated, sophisticated business consultant.  She graduated

2   from UCLA in 2008 with a degree in business economics and

3   accounting.  She has an employment background in business and

4   investment banking and has worked as an investment banker at

5   Goldman Sachs and Barclays.  She's also worked at various

6   technology start-ups, including founding and operating her own

7   company called Fuzzy Compass.  She has granted herself stocks

8   as a founder of Fuzzy Compass, and she has received

9   Board-approved stock from one of her employers, Plastiq.  All

09:36 10   of these grants were in writing.

11   Back to the timelines.  Your Honor, this morning I

12   sent to your clerk a slide deck.  I'm not sure if you've

13   received that.

14   THE COURT:  Like, three minutes ago.

15   MS. ROBERTS:  Okay.  If you could turn to that slide

16   deck, there's a timeline on the first page after the cover

17   sheet.  I think that this timeline will assist the Court.

18   It's undisputed that on March 25 of 2019, Ms. Hoffman

19   met with Mr. Silberstein in New York City to discuss a

09:37 20   potential role at Thras.io.  At the time she was interviewing,

21   she was unemployed and had no offers of employment.  A week

22   later Mr. Silberstein sent her an email outlining a compensation

23   package for a full-time employment role.  It included a base

24   salary of $220,000, a bonus potential of 50 to 100 percent, and

25   it stated 1 percent equity.

| | |
|---|---|
| 1 | THE COURT:  Now, let me just say, that's Exhibit 5, |
| 2 | right? |
| 3 | MS. ROBERTS:  Yes, your Honor, yes. |
| 4 | THE COURT:  Is that right? |
| 5 | MS. ROBERTS:  The email is Exhibit 5. |
| 6 | THE COURT:  For some reason, Exhibit 5 is marked |
| 7 | Exhibit 4, but, in any event -- |
| 8 | MS. ROBERTS:  Oh, I think, your Honor, there's a cover |
| 9 | sheet for Exhibit 5, I would hope, in your binder.  The reason |
| 09:38 10 | why it's marked as Exhibit No. 4, it was used as an exhibit in |
| 11 | a deposition. |
| 12 | THE COURT:  I see.  And where does it say here that |
| 13 | this is an email about full-time employment? |
| 14 | MS. ROBERTS:  Thank you, your Honor.  It's an |
| 15 | executive function:  "You'd be the most senior person in the |
| 16 | organization besides myself and Carlos." |
| 17 | THE COURT:  Where are you reading? |
| 18 | MS. ROBERTS:  In the first paragraph, he's talking |
| 19 | about -- sort of dreaming about this role, reporting to him. |
| 09:39 20 | He's a co-CEO.  That would be a direct reporting relationship |
| 21 | and underlines the other co-CEO.  A title of chief of staff or |
| 22 | whatever title she would like.  She'd be the most senior person |
| 23 | in the organization. |
| 24 | THE COURT:  All right, so it's your position that this |
| 25 | was -- |

1          MS. ROBERTS:  This is talking about an employment

2     relationship.

3          THE COURT:  So it doesn't quite say that, but you're

4     saying I should draw that reasonable inference based on the

5     language being used here?

6          MS. ROBERTS:  That is correct, your Honor.  In

7     addition, there's other evidence that it is a full-time

8     position, including her deposition testimony which is at

9     Exhibit 2 at Transcript Page 125.  When I asked her, "Was this

09:40 10     a full-time employment position?" she says "Yes."

11          THE COURT:  Okay, thank you.  All right, so, so far,

12     as of April 1st, we're talking a specific detailed discussion

13     of stock grants, but it's if she is a full-time employee.

14          MS. ROBERTS:  Correct, your Honor.  But Ms. Hoffman

15     ultimately came to interview.  And the executive leadership

16     team, really, she didn't -- she didn't get along with them, so

17     the co-CEOs came to the determination that employment role was

18     not going to work.  They got this feedback, and they decided

19     not to offer her this full-time employee role.

09:41 20          THE COURT:  Where does it say that?

21          MS. ROBERTS:  That's at Exhibit 6, Mr. Silberstein in

22     his deposition transcript at Page 31.

23          THE COURT:  Okay.

24          MS. ROBERTS:  And they think that she has some skills

25     that could be helpful to the company, and they offer her a

1    three-month consulting role for an aggregate amount of $84,000.

2    She admits that this was acceptable to her because it allowed

3    her to look under the hood of the company to better understand

4    before she herself would agree to a permanent position.

5          Thras.io presented Ms. Hoffman with a consulting

6    agreement.  She reviewed it, and she proposed her own changes

7    to the agreement.  She proposed a change to the duration or

8    term of the agreement, as well as a change to the timing of the

9    compensation under the agreement.  She did not ask for any

09:42 10   other modifications.  She did not ask for the inclusion of a

11   bonus.  She did not ask for the inclusion of equity.  All of

12   her proposed changes were accepted, and she signed that

13   agreement in late April.  That's Exhibit 10, your Honor.

14         It's undisputed that under the consulting agreement,

15   she was not entitled to a bonus or equity.  The agreement

16   provided for compensation at $28,000 a month for three months

17   for her services.  It said that that was payment in full.  It

18   said that the agreement superseded any other prior

19   understandings, agreements, or representations, written or

09:43 20   oral.  She agreed that the document could not be modified

21   except with a written instrument signed by the parties.

22         Having signed that consulting agreement, as a matter

23   of law, she cannot rely on any prior representations regarding

24   compensation.  This includes February communications, March

25   communications, and prior April 2019 communications with

1    Mr. Silberstein and Mr. Cashman related to an equity grant.

2           Ultimately, your Honor, she signed four integrated

3    consulting agreements that laid out her exclusive compensation

4    for her consulting services.  None of them had an option grant.

5    She signed an amendment in late July for a month that had the

6    same terms with respect to full compensation, scope of work, an

7    integration clause, and a "no modification" clause.  She did

8    the same in September and thereafter in October.

9           Having signed the amendments to the consulting

09:44 10   agreement, the latest being effective October 3 of 2019, as a

11   matter of law, Ms. Hoffman cannot reasonably rely on any prior

12   representations regarding compensation for her services.  This

13   includes summer and early fall communications with

14   Mr. Silberstein or Cashman.  There are no written agreements

15   between Ms. Hoffman and Thras.io related to compensation other

16   than the consulting agreements as amended.  It's undisputed she

17   received all compensation under the consulting agreements.

18           Your Honor, there's a second timeline.  There's a

19   second timeline that commences with Ms. Hoffman's exit

09:45 20   interview from Thras.io and continues into 2020.  While

21   Ms. Hoffman was providing her consulting services at Thras.io,

22   there's no evidence that she turned down any job offers.  She

23   testified she was looking for employment during her consultancy

24   between August and October of 2019, and she interviewed for a

25   position at Uber.

1          On or about October 24 of 2019, she notified Thras.io

2     that she had accepted a position at Uber and would begin on-

3     boarding there in early November.  She concluded her position

4     and consulting services to Thras.io on October 31.  There's no

5     dispute that as of October 31, she received all cash

6     compensation under the consulting agreement.  She gave notice;

7     she concluded her work; she had an exit interview with

8     Mr. Silberstein in New York.  During that meeting, he indicated

9     that although he wasn't contractually obligated to, that he

09:46 10     intended to recommend to the Board a contractual gift of

11     options.

12          It's undisputed that there were numerous

13     communications between Thras.io and Ms. Hoffman related to a

14     gift of incentive stock options, nonqualified options, or

15     restricted stock between January of 2020 and July of 2020.

16     During these communications, there was no change in

17     Ms. Hoffman's position.  She was employed at Uber.  The terms

18     of this discretionary grant were never defined.  There was no

19     agreement as to the number of options, the vesting schedule,

09:46 20     the strength price, and the gratuitous grant was never approved

21     by Thras.io's Board.

22          How do we know there was no agreement?  We know there

23     was no agreement by Ms. Hoffman's own words.  On January 5,

24     2020, months after she concluded her consultancy, she's asking

25     for paperwork reflecting the terms of her ISOs and asked to

1    confirm an essential term, the strike price.  On April 10 --

2              THE COURT:  Wait, wait.  Which exhibit is that?

3              MS. ROBERTS:  Your Honor, that is Exhibit 28, which is

4    a compilation of emails from Ms. Hoffman to Mr. Silberstein and

5    Mr. Joe Falcao.

6              THE COURT:  So where exactly is it you're saying?

7              MS. ROBERTS:  Sure, let me pull it up, your Honor.

8    So, let's see, on January 5 -- it is the last page of

9    Exhibit 28, which happens to also be Cashman Exhibit 28.

09:48 10              THE COURT:  Well, it says here, "Can you get me the

11    paperwork for my 150,000 shares for the ISOs?"

12              MS. ROBERTS:  Right.

13              THE COURT:  What does he answer?

14              MS. ROBERTS:  He answers, "The valuation has not been

15    completed.  It is in process."  He talks about a financing in

16    mid-December:  "Will know the strike price for updated shares

17    and can explore how much impact that has on the overall grant."

18    So in this particular document, there is no specificity with

19    respect to the quantum of shares.  There's no specificity in

09:49 20    terms of the term or the strike price.

21              On April --

22              THE COURT:  He's not denying that he promised her

23    something.  He's not saying, "Oh, well, that was if you were

24    still here," or, "Oh, you're misunderstanding what I said."

25              MS. ROBERTS:  We are not arguing that communications

1   regarding a potential gratuitous gift of options occurred.  We

2   see that here.  What we're saying is --

3           THE COURT:  So say that again.  So you're saying that

4   was a --

5           MS. ROBERTS:  This is gratuitous.  The service period

6   is over.

7           THE COURT:  So you're saying it was a gift if they

8   chose to give it or not?

9           MS. ROBERTS:  Correct, your Honor.  There was no

09:50 10  reliance.  There was no change of position.  These

11  communications --

12          THE COURT:  Well, look what it says here.  I mean, was

13  she offered the 150?

14          MS. ROBERTS:  What went south here was, there was,

15  uhm -- there was really an intention, a wish to sort of have

16  her be aligned with the company, all growing in the same

17  direction.  She was somebody that the company, you know,

18  understood was in the community and wanted to sort of align

19  interests.

09:50 20          There were many things that went south, one of which

21  was, they thought that there was some interference with respect

22  to a recruiting agency that soured their position.  But the

23  bottom line is:  They never came to the essential terms, and

24  there never was any reliance; there never was any change of

25  position with respect to this gratuitous grant.  The

1  communications continued.  Nothing was ever agreed to.  Nothing

2  was ever specific.

3          On April 10 she wants to "close the loop on my

4  nonqualified stock options," she writes.  She talks about, "I

5  can only exercise these options if there is a set exercise

6  window."  Of course, there was not.

7          On July 19 of 2020, she emailed Mr. Silberstein and

8  wrote that she needed "confirmation on market value of shares

9  from Q1 2019 valuation to calculate quantum of shares and

09:51 10  strike price."  None of the essential terms were ever agreed

11  to.

12          THE COURT:  Was it agreed to as to what kind of stock,

13  ISOs versus qualified stock options?

14          MS. ROBERTS:  No, never agreed to, your Honor.

15  Thras.io's Board --

16          THE COURT:  So basically what you're saying is, yeah,

17  she was promised a bunch of these things, but it was never in

18  writing, and the Board didn't approve it, so tough luck for

19  her?  Is that the basic bottom line?

09:52 20          MS. ROBERTS:  Well, with a bit of a caveat that, yes,

21  she was -- there was a wish, there was a wish to give her this

22  to align interests after her service period.  There was never a

23  promise to do so because there were no definite terms, and

24  there was no reliance.  She was at Uber; she never changed her

25  position.

         1              In addition, as we'll discuss, the First Circuit's
         2    *Goltsev* case controls here.
         3              With respect to Counts 2 for fraud, 3 for securities
         4    fraud, and 5 for promissory estoppel, reliance that's
         5    reasonable is required.  She complains that she was promised
         6    stock options for her consulting services.  She cites to March
         7    and April 2019 discussions prior to signing her initial
         8    consulting agreement.  She also talks about further
         9    communications in July, August, and September.  These were oral
09:53 10    communications.  Oral promises of stock options cannot support
        11    reasonable reliance because she had the consulting agreement,
        12    made revisions that were accepted.  After each promise that she
        13    alleges was made, she signed a new integrated contract
        14    providing that this was the exclusive compensation for her
        15    services.  Any promises, false or not, concerning stock options
        16    prior to her signing the first consulting agreement were
        17    contradicted by the express terms of the consulting agreement,
        18    Paragraph 3, that says that it's compensation for --
        19              THE COURT:  You know, I don't have all -- you know,
09:54 20    you've gone all through that, so --
        21              MS. ROBERTS:  I will move on.
        22              THE COURT:  Yes.  So the thing I'm struggling with a
        23    bit is, there's no dispute that the promises were made, but
        24    there is a dispute as to whether they were definite enough to
        25    induce reliance.

1          MS. ROBERTS:  Right.  A promise has to be definite to

2     be relied on --

3          (Cross-talk.)

4          THE COURT:  -- she can't trust anyone.  I mean,

5     Mr. Silberstein promised again and again and again "You'll get

6     something," and it just never happened.  You're just saying

7     it's tough luck basically.

8          MS. ROBERTS:  It never happened.  She was a

9     well-compensated consultant who bargained for compensation

09:54 10     through her consulting agreement, which was specific.

11          I'd like to direct the Court's attention to Page 2 of

12     the slide deck.  Ms. Hoffman's case lines up with *Goltsev*.

13     Excuse me.  I'll move to actually Page 3 of the slide deck, the

14     *Goltsev v. Hoffman* case.  The *Goltsev* case is a First Circuit

15     case from this year affirming Judge Burroughs' motion for

16     summary judgment.  Dr. Goltsev, like Ms. Hoffman, was a

17     sophisticated plaintiff.  He was a physician.  In that case, he

18     relied on an oral promise of equity in a medical practice up in

19     Beverly.  There was email chatter about the equity interest.

09:55 20     He brought the same types of claims as Ms. Hoffman:  breach of

21     contract, fraud, promissory estoppel.  He had the sophisticated

22     background; he reviewed the contract before he signed it; he

23     made edits before he signed it.

24          That contract, like this contract, had the same full

25     compensation.  It had the same integration clause, entire

1   understanding, the same clause that you can't rely -- it

2   superseded all prior understandings, whether oral or written.

3        Dr. Goltsev signed the contract just once.  Our

4   plaintiff here signed it four times.  In addition, our

5   agreement says that "The company shall not be responsible for

6   paying any other fees, costs, or expenses."

7        *Goltsev* determines this case.

8        THE COURT:  I'll read *Goltsev*, but I think we probably

9   only have about five more minutes, and I'm going to turn it

09:56 10   over to plaintiff's lawyer.  So I will read that.

11        MS. ROBERTS:  Okay, thank you, your Honor.

12        THE COURT:  I do understand that you feel like this is

13   on all fours.

14        MS. ROBERTS:  This is on all fours.  *Goltsev* controls.

15        I'll move on to the 93A claim, your Honor.

16        THE COURT:  Thank you.

17        MS. ROBERTS:  The 93A claim, your Honor, is Count 6.

18   This is a private transaction, an inter-enterprise dispute, and

19   not proper for 93A.  There is no trade or commerce here.  The

09:57 20   First Circuit's case in *Dedman* is on all fours, as is

21   Judge Dein's *Allstate Insurance* case.  Here we have a

22   contractor who was devoted entirely to providing services for

23   Thras.io.  Her job was to understand the organizational goals

24   of various departments, conduct organizational infrastructure

25   analysis, identify methods to help organizations accomplish her

goals.  She admits in her interrogatory answers that she did
not provide services to any other person or entity.  She pled
the same in her complaint at Paragraph 42, and it's undisputed
that she did not offer her services to any other business.  She
said, "I was basically doing a full-time job."

This is an inter-enterprise dispute.  She cannot bring
a claim for 93A.

Finally, your Honor, there are other defenses with
respect to 93A.  There's no evidence that defendants acted
egregiously, and she cannot show harm.  Even her own expert has
said he can't put together damages with any degree of certainty.
Ms. Hoffman's obligation not only requires a reasonable
certainty as to damages, but her expert says he does not have
any degree of certainty as to her damages.

Finally, your Honor, Delaware law applies.  Count 4 is
the breach of contract claim.  The misclassification claim was
dismissed.  As a matter of law, Delaware applies to this
contract claim.  Ms. Hoffman relies only on emails and chatter
regarding an intent to issue stock --

THE COURT:  I meant to ask you that.  Under Delaware
law, you have a strong claim, but if I said it was Massachusetts
law, is it the same?

MS. ROBERTS:  Massachusetts law would have a different
analysis, your Honor, but as the Court -- the Court did suggest
in its memorandum and order on the motion to dismiss that

 1    Delaware law applies, and that's the right analysis, your

 2    Honor.  Under Delaware law, an agreement to grant equity is

 3    only enforceable if it's contained in a writing that describes

 4    the rights attached to the issuance and is approved by a board

 5    of directors, by the Board in this case, by a written Board

 6    approval.  We pointed the Court's attention --

 7            THE COURT:  But here it's Cashman and Silberstein, so

 8    it's clear that Silberstein was leading her way.  I don't know

 9    whether --

10:00 10        MS. ROBERTS:  Yes, agreed.  In this case, right now

11    Cashman and Silberstein are the Board members during at least

12    one relevant time period, that there is what can only be

13    described as email chatter.  But the email chatter --

14            THE COURT:  Did Cashman say anywhere, "I agree that

15    she should get a stock grant of 150," whatever it was?

16            MS. ROBERTS:  Not with the type of specificity that's

17    required under Delaware law.  He would need to -- there was no

18    evidence regarding the type of equity.  There was no agreement

19    as to the quantum of equity.  There's no agreement as to the

10:01 20   vesting schedule.  There's no agreement as to the exercise

21    price.  A wish to give a gift of equity that is in an email is

22    not enough.  You need Board approval and you need

23    specificity --

24            THE COURT:  The thing that struck me on the motion to

25    dismiss, what you say is actually right under Delaware law, but

 1    we only have two people that were involved in the emails.  I

 2    thought maybe there would be something that came out in

 3    discovery that they both agreed to it.

 4         MS. ROBERTS:  It is undisputed there is no Board

 5    resolution, and there is no specificity with respect to the

 6    things that you would need to have a grant of stock options.

 7         THE COURT:  What's an ISO?  Do you know?

 8         MS. ROBERTS:  Incentive stock options.

 9         THE COURT:  Right.  Well, what is that?  That's for an

10:02 10    employee?

11         MS. ROBERTS:  That's for an employee that has

12    preferable tax treatment, and at Thras.io, typically an

13    employee would be given a grant of incentive stock options that

14    would have what they call a "one-year cliff," so you would -- a

15    one-year cliff and a four-year vesting schedule.  Ms. Hoffman

16    was not given ISO.

17         THE COURT:  Because she wasn't an employee, but --

18         MS. ROBERTS:  She wasn't an employee.

19         THE COURT:  Well, what is the other kind of stock

10:02 20    options that she could have gotten?

21         MS. ROBERTS:  There is communication with respect to

22    receipt of a nonqualified stock option.

23         THE COURT:  What's that?

24         MS. ROBERTS:  A nonqualified stock option would have

25    less preferential treatment.  It could be given to somebody who

1    was not a service provider.

2         THE COURT:  All right, and you're saying that there

3    was no specificity as to whether or not she'd get that kind of

4    an option?

5         MS. ROBERTS:  There's absolutely none.  In the spring

6    of 2020, they're still talking about what type of option could

7    be given or whether it could be a grant, what the quantum would

8    be, whether there would be an exercise price.  It was never

9    ever set.

10:03 10        THE COURT:  Thank you.

11        All right, so now I'll move to plaintiff.  Thank you.

12        MS. ROBERTS:  Thank you, your Honor.

13        MR. CARNATHAN:  Thank you, your Honor.  I mean, the

14   core difficulty with the defendant's position, as your Honor

15   knows better than any of us, is that they're arguing as if this

16   was a closing argument after trial.  They're arguing all the

17   inferences in their favor and trying to argue the evidence in

18   their favor, and ignoring all the evidence that Ms. Hoffman has

19   submitted, and her entitlement to the fair inferences.

10:03 20        I mean, she testified, you know, with great clarity

21   over and over again that she was promised this grant before she

22   started.  She was promised it again in intervals throughout her

23   time at Thras.io.  And she sat down before she left, and she

24   went over the terms, and they were highly specific.  And I can

25   point your Honor to many, many pages for this.

       1              THE COURT:  Well, that's what I think you need to do
       2    because when I draw reasonable inferences in her favor, I do
       3    agree there were oral promises, but I had not yet to see a
       4    written promise with specificity.
       5              MR. CARNATHAN:  Well, let me start, your Honor --
       6              THE COURT:  I've got these big thick exhibit pages in
       7    front of me, so I would like to see where it says in writing,
       8    because I think that's what you need to have, what the promise
       9    was, and --
10:04 10              MR. CARNATHAN:  So let me perhaps share screen and
      11    show your Honor some of the documents at issue.
      12              THE COURT:  Thank you.
      13              MR. CARNATHAN:  Just a moment.
      14              THE COURT:  What am I looking at?
      15              MR. CARNATHAN:  I'm actually going to move to a
      16    different point in my argument.  I was going to start somewhere
      17    else, but this one is a June 1, 2020 email where
      18    Mr. Silberstein tells Ms. Hoffman that what she would get is a
      19    form of grant document, which is different than the consulting
10:05 20    agreement; and that just confirms Ms. Hoffman's repeated
      21    testimony that she was told that the consulting agreement dealt
      22    with her cash compensation, and that there would be separate
      23    paperwork to deal with her equity grant, and to quote/unquote
      24    "not worry about it."  She in particular says that at Page 152
      25    of her deposition.  That excerpt is included in Exhibit 1 to

the Carnathan Affidavit in support of our opposition to the

motion for summary judgment.

        THE COURT:  Right, can you just answer my question in

the sense of it's a very thick record.  I want to see where it

says in writing the specific terms of a grant option.  If it's

only oral, we don't have to deal with that legal issue, but if

it's in writing, it's a different issue.

        MR. CARNATHAN:  Well, I have to combine a few different

documents, your Honor.  And so I do have writings, and I do

have explicit testimony.  There is Thras.io Exhibit 24 to their

submission on summary judgment in the summary judgment record.

This is one of those confusing ones.  If you look at the sticker

at the top, it was Cashman Exhibit 26 of his deposition, but in

the summary judgment record, it's Exhibit 24.  And when we look

down toward the bottom of that document, Mr. Silberstein says

on October 22, 2019, "I recommend we get ahead of it by

granting Sasha options equivalent to what she would have earned

full time over the past six months and trying to manage her

mindset before talking to Stephanie."

        Now, there's a lot going on here, but the important

part, I think, to the answer to your Honor's question at this

moment, is this is Mr. Silberstein saying in writing to

Mr. Cashman, "Let's grant Sasha options equivalent to what she

would have earned full time over the past six months."  We

scroll up to the top, and Mr. Cashman on that same day, with a

cc to Danny Bookvar, who was the president at the time, and he

says, "Agree with all this, and like Josh's considerations

below, especially around Sasha.  She's a powerful voice.  I

hope she understands it was just not a personality fit with

what we built at her level."

So he's saying, "Yes, agreed, we should give Sasha the

options," the six months' worth of options, as if she had been

a full-time employee for that whole time.  Now, that maps to

other documents in the record --

10:07   THE COURT:  Well, where does it say six months?  It

says three months.

MR. CARNATHAN:  Down below, your Honor, at the bottom

of this Thras.io Exhibit 24.

THE COURT:  No.  Silberstein is saying six months, and

Mr. Cashman is saying three months.  Am I wrong?

MR. CARNATHAN:  "She does need to transition.  If we

give her three months, I expect she'd give us whatever time Gio

and Hannah need to take over the Greenhouse."  He's proposing

maybe they keep her around even longer.  They had kept her

10:08   around -- her original consulting contract was three months.

Then they signed her up for another month, another month,

another month.  So she was there a total of six, but she was

still doing good things for them.  And that was part of the

stringing her along thing.

We also adduced evidence during discovery that by June

1    of 2019, they already decided they weren't going to bring her

2    on full time, and they didn't tell her that.  And, for example,

3    if your Honor were to look at Exhibit 21 --

4          THE COURT:  So if this is what you're relying on,

5    Exhibit 26 doesn't do much for you.

6          MR. CARNATHAN:  Well, Exhibit 26 --

7          THE COURT:  They're still sort of debating what to do,

8    kind of thing.  They don't want her to be pissed off.  Excuse

9    my French.  They're thinking three months, six months.  You

10:09 10   know, they're just not sure.

11         MR. CARNATHAN:  With apologies, your Honor, I think

12   that they're saying, "Should we keep her on three more months,

13   transition to do what she's doing in recruiting and stuff?"

14   They're thinking of keeping her a total of nine months.  But

15   he's already agreeing that "We should give her what she would

16   have earned in the options, would have earned full time over

17   the past six months."  That's what Mr. Silberstein is saying,

18   and I think Mr. Cashman says "agreed."

19         You know, reading this in favor of the plaintiff, that

10:09 20   is a writing exchange between the only two Board members at the

21   time, Cashman and Silberstein, saying "Let's give her the six

22   months."  And that is what Ms. Hoffman has testified over and

23   over and over again is what they had promised her all along,

24   going back to April, repeated innumerable times.  And, really,

25   our submission, Exhibit 1 to my affidavit, has many, many

1      pages --

2              THE COURT:  Excuse me.  So I understand what you're

3      saying is, if we give her three months, that's about

4      consulting; it's not about three months' worth of options, is

5      what you're saying?

6              MR. CARNATHAN:  Correct.  The second paragraph is

7      dealing with, "Should we keep her on as a consultant even

8      longer?  She does need (Interrupted audio) what she's doing in

9      recruiting and stuff."

10:10  10             She's still doing work for them.  She is recruiting

11     people.  She's -- I'm going to forget now, but she's doing

12     structural work.  She's figuring out how they're going to

13     onboard companies.  She was doing some really good stuff for

14     them, which is why they kept extending her consulting contract.

15     And so he's talking about the transition, but in the first

16     paragraph he's agreeing with the statement that "We should give

17     her the six months' worth of options."

18             Now, the additional writings confirm this.

19     Ms. Roberts showed you one of them, which is, you know, a

10:11  20     valiant effort to spin a really bad document for them into, you

21     know, a good document for them.  But it's terrible for them.  I

22     mean, Ms. Hoffman says, "Can you get me the paperwork for my

23     150,000 shares in Thras.io?"  And, you know, they try to make

24     her out as some big sophisticated person, you know, it's all

25     about corporate equity; but, you know, the fact that she

1    misspoke there is not good for them.  I mean, the better point

2    is what your Honor pointed out: He doesn't say, "Oh, we never

3    promised you 150,000 bucks."  He says, "We're still working on

4    the valuation, and we can either grant you NQOs --" that's the

5    nonqualified options -- "or restricted stock."  And so the

6    thing is, she's transitioning out.  This harmonizes exactly --

7              THE COURT:  Excuse me.  What exhibit is this?

8              MR. CARNATHAN:  This is Thras.io submission summary

9    judgment record Exhibit 28.

10:11 10          THE COURT:  Thank you.

11             MR. CARNATHAN:  Which has the virtue of also being

12   Cashman Exhibit 28, so it's less confusing than most.  And this

13   is another one of what we say is a misrepresentation where he

14   tells her, "The valuation has not been completed, it's in

15   process."  You know, he's stringing her along again, but he's

16   not objecting.  She says, "Where's my 150,000 bucks in stock?"

17   and he says, "Well, we're working on it.  We can either give

18   you NQOs or restricted stock."

19             THE COURT:  What's an NQO?

10:12 20          MR. CARNATHAN:  That's short for the nonqualified

21   option.  That's what you can give to someone who's not an

22   employee or no longer an employee.

23             THE COURT:  So that's a non-employee?

24             MR. CARNATHAN:  Correct, your Honor.  By this point --

25             THE COURT:  And he said, "We can either give you an

```
 1    NQO or a --"
 2          MR. CARNATHAN:  Or restricted stock.
 3          THE COURT:  Which means what?  Restricted like how?
 4    You can only exercise it after a certain period of time?
 5          MR. CARNATHAN:  I believe there are limitations on the
 6    sale, your Honor.  I haven't studied the specific terms of
 7    their -- particularly when you have restricted stock, you're
 8    not allowed to sell it for some period of time.
 9          THE COURT:  So it's a holding.  So they haven't
10    decided yet what it looks like.
11          MR. CARNATHAN:  Well, there's still the -- what
12    Mr. Silberstein is saying here is that "We can do it one of two
13    ways," but this is in keeping with what he told her all along,
14    and if I can show you some of her deposition testimony -- I'll
15    just find it quickly.  I'm now in Exhibit 1 to my affidavit,
16    the submission in opposition to summary judgment.
17          So she says, "There was full clarity to me that every
18    month he had been reiterating the exact same message.  He never
19    changed his message.  It was exactly the same all along.  He
20    never told me I wasn't going to be getting it.  There was, as
21    you know, zero confusion in my mind that we had complete
22    agreement that I was going to be delivered shares for the time
23    period that I worked there that were fully vested.  And if it
24    was full time, it would be ISOs, and if it was not, then I
25    would be getting non-quals or restricted stock.  The
```

1    recommendation was to non-quals."

2          So, I mean, she's testified to this with great clarity

3    over and over and over again, and the documentary record

4    supports her testimony.  You know, were there disconnects?

5    Sure, but that's only because Mr. Silberstein is now disavowing

6    his promises and pretending it's a gift.

7          Now, perhaps the single most clear statement of what

8    he promised her is found at Page 267 of her deposition

9    testimony.  Sorry.  I'm scrolling too fast.  This is again part

10:14  10   of Exhibit 1 to the Carnathan Affidavit in opposition to the

11   motion for summary judgment:  "He proactively said he was going

12   to be giving me the share grant that he had promised me since

13   the beginning.  He said the amount was $150,000 of equity.  He

14   said that it's vested for the period that I worked there.  So

15   they will give me the grant, and it's prorated based on what I

16   had originally done full time.  This was a six-month grant of

17   the original sort of $1.2 million, which gets you to $150,000.

18   He said it will be based on the valuation when you started, but

19   they're in the midst of a 409A, so they need to get me the

10:15  20   paperwork, and that was that.  And I said --"

21          THE COURT:  What's a 409A?

22          MR. CARNATHAN:  409A is sort of a formal valuation

23   that companies do to set the strike price on an option, and the

24   idea being that you want the strike price, frankly, to be as

25   low as possible toward your employees, but you can't go too low

1    or the IRS will whack you for taxes.  And so they go through

2    this process to figure out what the option price should be, and

3    those, there's a series of them in the record attached to --

4         THE COURT:  So assuming I agree with you that there is

5    a lot of oral discussion, or even email discussion, does this

6    all hinge on whether Delaware law applies or not?

7         MR. CARNATHAN:  I don't think so, your Honor.  I mean,

8    I would posit that Mass. law should apply.  I think that

9    *Mindspirit* case is a good one, and that one should not just

10:16 10   apply the internal affairs doctrine without thinking through

11   what's really going on here.  You know, this is not a claim

12   that impacts the internal affairs of the company or threatens

13   its capital structure.  This is a claim for damages --

14        THE COURT:  Well, sure it does, I mean, if you're

15   allowed to orally give out stock.

16        MR. CARNATHAN:  Well, orally give it out as the CEO

17   and co-Board member in accordance with what you and your Board

18   member agreed to.  Remember, we're not dealing with IBM here.

19   This is not some massive company, and she's not talking to the

10:16 20   VP of HR.  She's talking to the majority stockholders, the two

21   Board members and the co-CEOs.  I mean, this is serious stuff

22   and reasonable for her to rely on them.  But even if we go to

23   Delaware law --

24        THE COURT:  I pretty much already ruled that, I think.

25        MR. CARNATHAN:  I think your Honor clearly applied

1   Delaware law in the dismiss, and I think you cited the *First*

2   *American* case.  The thing is that even under Delaware law,

3   Delaware law allows for or requires a writing.  And I just

4   showed you one between the two Board members.  That's the

5   Exhibit 24.  So we have a writing.  We have approval by the

6   only two Board members.  And this notion that it has to be some

7   sort of formal thing is just not reflected in the cases.  Even

8   the *Grimes* case from back in 2002 -- I think it's at Page 266 --

9   I'm going to fumble to find the exact cite for your Honor --

10:17  10   THE COURT:  So I'm likely to apply Delaware law, so to

11   the extent that I do, what you're saying is that Exhibit 24,

12   when Mr. Cashman says "Agree with all this and like Josh's

13   considerations below," that's enough to be a ratification?

14   MR. CARNATHAN:  That is what I'm saying, your Honor.

15   THE COURT:  Okay, so your case hinges on Exhibit 26?

16   MR. CARNATHAN:  24.  24 is very important --

17   THE COURT:  Well, yes, Exhibit 24, which is Cashman

18   Exhibit 26?

19   MR. CARNATHAN:  Yes.  I'm sorry, your Honor.  Yes,

10:18  20   it's confusing.  But there is also the fact that Delaware law

21   has softened since the old cases.  You know, these old cases

22   that apply wouldn't leave the obligation to do this formal

23   process.  Even if the wrongdoers are using that to cover their

24   wrongdoing, it's a thing of the past.  The statute was amended

25   effective April 1, 2014, to put in Sections 204 and 205 called

1    the *Numoda* case.  I'm probably saying it wrong but --

2              THE COURT:  That's the ratification aspect.

3              MR. CARNATHAN:  Right, right, and it explicitly says

4    that the statute was amended to deal with situations like this

5    where, for personal reasons, the very people who are complicit

6    in failing to follow the formalities are now disavowing.  And

7    so that's a perfectly valid approach to holding these guys to

8    their promises through a ratification or a validation process.

9              And I should note, in the reply I think the defendants

10:19 10   claim that we were obligated in the complaint to bring a count

11   for that, and that's just not so.  I mean, right in Delaware

12   Code 204(i), it says that statutory validation is not the

13   exclusive means of validating or ratifying.  And so it's

14   perfectly legally acceptable to, on this evidence, say that

15   there's a ratification or validation issue here.  These are the

16   two guys that made the promises.  These are the two guys that

17   didn't follow the corporate formalities, and now they're trying

18   to use that to cover their tracks, and that's really inequitable.

19   And Delaware doesn't roll that way anymore.  Maybe it did back

10:20 20   in 2004 or -- you know, I'm going to forget the dates of the

21   cases, but definitely since *Numoda* and since the revision of

22   the statute, it's not so anymore.

23              THE COURT:  So you know this law better than I do.  So

24   you're saying that an email between the two principals is

25   sufficient to be a ratification?

1          MR. CARNATHAN:  Yes.  It certainly raises a sufficient

2     inference to try a case over it.

3          THE COURT:  Thank you.

4          MR. CARNATHAN:  I think the other point I should

5     probably touch on is this reliance issue about the contract in

6     *Goltsev* -- I'm probably saying that wrong too -- but the

7     *Goltsev* case is something that didn't really change anything.

8     It's the same old principles.  The difficulty for Dr. Goltsev

9     was not the law; it was the fact that the promise he alleged

10:21 10    was squarely contrary to his contract.  He said he was going to

11    be a partner in 18 months.  The contract he signed said that he

12    would still be an employee after 24 months, terminable at will

13    with some notice period and subject to renewal.  So it was

14    directly --

15          THE COURT:  Isn't that the same here that says, "This

16    is the full compensation that you're going to get"?

17          MR. CARNATHAN:  Well, there's no reference to the

18    equity in there, none.  Ms. Hoffman has repeatedly testified

19    that she understood that was just the cash, and that

10:21 20    Mr. Silberstein told her over and over again, "Don't worry

21    about it.  We're going to get you separate paperwork for the

22    grant."  We have an email from Mr. Silberstein saying, you

23    know, "There's separate paperwork for your grant."  You know,

24    the evidence is really their problem here, not the point of

25    law.  The point of law says that if the document is integrated,

then you're barred from raising prior oral assertions that are
specifically inconsistent with a specific point in the
contract; and there's no specific point in this contract with
regard to these assertions are inconsistent.  And, in any
event, we have innumerable oral assertions documented in emails
before and after this thing was signed.  And in fact I can give
your Honor specific page numbers where Ms. Hoffman said that he
reiterated these promises along the way in July, August,
October.  He actually told her the same thing when she signed
the extensions.  Those are Pages 204 --

          THE COURT:  So I'm trying to understand.  $150,000 is
so small.

          MR. CARNATHAN:  Yes.

          THE COURT:  Why wasn't this settled?  Is it because
it's now worth a lot more than this?

          MR. CARNATHAN:  It became worth a ton of money, your
Honor.  It's kind of a lottery ticket case.  I mean, the
analogy I think of is, you put a scratch ticket in someone's
birthday card and you've just given them 20 bucks.  And then
they scratch off the card, and they hit the $4 million, and you
snatch the thing back and say, "Wait a minute.  I meant to give
you 20 bucks."  And that's kind of what happened here.  This
company when she was there was a little tiny company.  It was a
start-up.  It wasn't worth a heck of a lot of money.  Not that
$150,000 is something to sneeze at, but, you know, it wasn't

1    life-changing money.  But then this company went on to become

2    the unicorn of the, you know, the early 20th century and became

3    worth something like $6 billion over the course of the

4    following year or two.  And all of a sudden her little $150,000

5    grant of equity was worth a ton of money, and all of a sudden

6    they're saying, "No, we're not doing that --"

7         THE COURT:  I don't understand that.  So why would a

8    $150,000 grant of equity now become that amount of money, like,

9    from May of 2019?  Is it just that you would have gotten it in

10:23 10   May, 2019, and it explodes in value?  Is that -- you're

11   thinking you're entitled to the whole thing?

12        MR. CARNATHAN:  Correct, your Honor.  They cheated

13   her, if you will, out of stock in the company, and that stock

14   in the company would have been X number of shares.  You know,

15   the evidence triangulates on various numbers, but I would

16   respectfully submit it's probably around 17,500 shares.  So,

17   you know, if she gets those shares, and if the moment she gets

18   them they're worth 150 grand, okay, real money.  But if that

19   number then multiplies so that she could have sold those shares

10:24 20   for $300 a share, all of a sudden we're talking about a lot of

21   money.  And you can see in those emails in Exhibit 28 where

22   Silberstein is saying, "Oh, yeah, don't worry about it.  I'm

23   going to get you the paperwork, and we do non-quals or

24   restricted."  And so he's telling her everything is fine, and

25   then all of a sudden, I want to say in July -- I can probably

 1   find the emails -- but all of a sudden the general counsel

 2   comes back and says, "Oh, since you had your conversations with

 3   Josh, we're not doing these true-ups anymore," and they want to

 4   give her a small fraction of what she had been promised, and

 5   that's because the company had exploded in value.

 6            THE COURT:  Okay, well, we're now at about an hour.

 7            MS. ROBERTS:  Your Honor, may I be heard just for a

 8   few points?

 9            THE COURT:  Yes.

10:25 10            MS. ROBERTS:  Thank you, your Honor.  Mr. Carnathan

11   and Ms. Hoffman are asking you to write a contract that doesn't

12   exist.

13            THE COURT:  I can't hear you.  I'm sorry.

14            MS. ROBERTS:  Oh, I'm sorry.  Can you hear me now?

15            THE COURT:  Better.

16            MS. ROBERTS:  Okay, I'll speak up.  Mr. Carnathan and

17   Ms. Hoffman are asking the Court to write a contract that was

18   never agreed to.  He's pointed to the Exhibit 24, what we are

19   calling, you know, "email chatter."  There's no number of

10:25 20   shares.  There's no decision about whether they're ISOs or

21   nonqualified options.  There's no exercise price.  There's no

22   method.  There's no quantum of shares.

23            The Delaware Court of Chancery in the *CertiSign* case

24   is instructive here.  The *CertiSign* court said these basic

25   requirements for stock option are not onerous, but you need

1    formal Board approval and specificity.  We don't have either

2    here.

3          THE COURT:  So in a world where everybody is emailing

4    everybody, if not texting and WhatsApp'ing people, if you've

5    got only two Board members agreeing -- "I'm in agreement," says

6    Mr. Cashman -- is that enough to be a ratification?

7          MS. ROBERTS:  It's not, your Honor.  Formality is

8    something different.  A Board consent or a Board ratification

9    is what's required.  Co-CEOs and Board members can have

10   communications, but you need something that has that manifest

11   formality of formal Board approval, your Honor.

12         THE COURT:  And what does that mean, something in the

13   minutes?

14         MS. ROBERTS:  It could be a ratification in the

15   minutes.  It could be some type of award that is then Board

16   approved in the minutes, yes, your Honor.

17         THE COURT:  Is there something in the corporate bylaws

18   that says what it is?

19         MS. ROBERTS:  Where it sounds and where it's defined

20   is Section 157(b), right?  157(b) says it has to be specific.

21   "The terms upon which --"

22         THE COURT:  157(b) is what?

23         MS. ROBERTS:  Delaware Code Annotated, Title 8,

24   Section 157(a) and (b).  But (b) speaks to specificity:  "The

25   terms upon which, including the time or times which may be

1  limited or unlimited in duration, at or within which, and the

2  consideration, including a formula by which such consideration

3  may be determined, for which any shares may be acquired from

4  the corporation upon the exercise of any such right or option,

5  shall be as stated in the certificate of incorporation, or in a

6  resolution adopted by the Board of Directors, or by any other

7  person or body authorized pursuant to this section."

8      There was no Board approval.  There was never a

9  meeting of the minds as to --

10:28 10      THE COURT:  Well, what does Board approval mean when

11  you only have two guys?

12      MS. ROBERTS:  When there's two guys?  It would be

13  Board minutes, your Honor.

14      THE COURT:  You're saying it has to be included in the

15  minutes?

16      MS. ROBERTS:  Yes, your Honor.

17      THE COURT:  Formal resolution, formal minutes.  And is

18  that part of the bylaws of the company, or is it in the

19  statute?

10:28 20      MS. ROBERTS:  It's in the statute, your Honor.

21      THE COURT:  It has to be in the minutes?

22      MS. ROBERTS:  Well, it says specifically in the

23  statute -- let me read it one more time -- "shall be stated in

24  the certificate of incorporation or in a resolution."  So it

25  needs to be a Board resolution adopted by the Board.

1          THE COURT:  Thank you.

2          MS. ROBERTS:  There's no evidence that that exists

3     here, your Honor.

4          MR. CARNATHAN:  If I can just in two sentences

5     respond, your Honor, that *Feldman*, 956A 2d 644, it says exactly

6     the opposite.  It's a Delaware case from 2007.  This is back in

7     the dark days before they amended the statute.  Footnote 67:

8     "While airtight written documentation of a resolution granting

9     options is a prudent course of action for directors who wish to

10:29 10    avoid future legal challenges, Section 157(b) does not

11    expressly require that the resolution be included in the

12    minutes of the Board meeting at which it was adopted, or that

13    the resolution be in writing."  So it's just not so.

14          And just really quickly, I would point your Honor to

15    Exhibit 33 to my affidavit, which is Cashman 27, just as

16    further confirmation of the ratification.  If I can share the

17    screen really quickly, this is on October 25, a couple days

18    later, another correspondence among Josh Silberstein, Carlos

19    Cashman, Danny Bookvar, the president, and Taylor Rego, who was

10:30 20    in-house counsel.  Attorney Rego, I don't know if she's still

21    there, but this one is Cashman 57, which is confusing as always.

22    But at the bottom it says, "Josh to inform Sasha of her options

23    award on Monday in NYC."  Just further written confirmation

24    that they had agreed to this; this is what they were going to

25    do.

```
 1              THE COURT:  Excuse me.  Can you go to the top of the
 2   page.
 3              So this is No. 27?
 4              MR. CARNATHAN:  It's in the summary judgment record as
 5   Exhibit 33 to my affidavit.  It was 27 at the Cashman deposition.
 6              THE COURT:  Well, anyway, I'm having trouble locating
 7   it because of the different numbers.  So in the record you gave
 8   me, what number is it at?
 9              MR. CARNATHAN:  It's going to be Exhibit 33 to my
10   affidavit.
11              THE COURT:  Okay, thank you.
12              MS. ROBERTS:  Your Honor, this 23 --
13              THE COURT:  Can I get there?  Hold on.  Hold on.  I'm
14   having trouble finding all these things because they're just
15   numbered differently in the exhibit book than they are in
16   the -- okay.  Who's Stephanie, by the way?
17              MR. CARNATHAN:  There's a couple of Stephanies.
18   There's Stephanie Amancio.  There's a Stephanie -- oh, in this
19   email, the Stephanie referenced is Stephanie Amancio.  She was
20   an HR person they let go.
21              THE COURT:  Oh.
22              (Pause.)
23              THE COURT:  Okay, so I see where that is in writing.
24   Does it provide anywhere, like in attachments or something, any
25   of the details?
```

1          MR. CARNATHAN:  It does not, your Honor.  We have to

2     connect the dots between those various documents and the

3     testimony.

4          THE COURT:  Okay, thank you.

5          MS. ROBERTS:  Your Honor, what Mr. Carnathan just said

6     is sort of the point here:  You can't connect the dots.  In

7     order to comply with Delaware law, you need specificity, and

8     you need a written writing approved by the Board.  That's not

9     here.  There's so much missing from this document.  There's a

10:32 10    reference to about 16,500 options.  We don't know the exercise

11    price or the exercise method.  All of those things are required

12    by the Delaware Court of Chancery in *CertiSign.*  Also *Storage

13    Networks*, the Massachusetts Appeals Court has spoken to this

14    very issue.

15          THE COURT:  All right, thank you.  All right, we're

16    done with the argument.  Let's go off the record for a minute.

17          (Discussion off the record.)

18          MR. CARNATHAN:  Thank you, your Honor.

19          MS. ROBERTS:  Thank you, your Honor.

10:36 20    (Adjourned, 10:36 a.m.)

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4

UNITED STATES DISTRICT COURT )
5    DISTRICT OF MASSACHUSETTS   ) ss.
CITY OF BOSTON                )
6

7

8           I, Lee A. Marzilli, Official Federal Court Reporter,

9    do hereby certify that the foregoing transcript, Pages 1

10   through 40 inclusive, was recorded by me stenographically at

11   the time and place aforesaid in Civil Action No. 20-12224-PBS,

12   Sasha Hoffman v. Thras.io, Inc., et al, and thereafter by me

13   reduced to typewriting and is a true and accurate record of the

14   proceedings.

15           Dated this 5th day of February, 2023.

16

17

18

19

20           /s/ Lee A. Marzilli
             _____
21           LEE A. MARZILLI, CRR
             OFFICIAL COURT REPORTER
22

23

24

25